UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

ADRIANA G. KAM-O'DONOGHUE,
as Personal Representative
of the Estate of
ALEXANDER CASTRO,
     Plaintiff,                    CIVIL ACTION NO.
                                    16-11054-MLW

     v.

JOHN TULLY, KEITH SALACH,
and THE CITY OF LAWRENCE, MASSACHUSETTS,
     Defendants.

**REPORT AND RECOMMENDATION RE:**
**DEFENDANT JOHN TULLY'S MOTION FOR SUMMARY JUDGMENT**
**(DOCKET ENTRY # 59); DEFENDANT KEITH SALACH'S MOTION FOR SUMMARY**
**JUDGMENT (DOCKET ENTRY # 61); DEFENDANT, THE CITY OF LAWRENCE'S,**
**MOTION FOR PARTIAL SUMMARY JUDGMENT (DOCKET ENTRY # 63);**
**PLAINTIFF'S CROSS MOTION FOR SUMMARY JUDGMENT ON THE CITY'S**
**LIABILITY FOR THE NEGLIGENCE OF TULLY (DOCKET ENTRY # 68);**
**DEFENDANT'S MOTION TO STRIKE (DOCKET ENTRY # 73)**

**March 29, 2018**

**BOWLER, U.S.M.J.**

Pending before this court are motions for summary judgment
filed by defendants Lawrence Police Department Officer John
Tully ("Tully"), Lawrence Police Department Officer ("Salach"),
and the City of Lawrence ("the City") (collectively
"defendants"). (Docket Entry ## 59, 61, 63). Plaintiff Adriana
Kam-O'Donoghue, as Personal Representative of the Estate of
Alexander Castro ("Castro"), opposes the motions. (Docket Entry
# 71). Castro also filed a cross motion for summary judgment
against the City regarding the City's liability for Tully's
negligence. (Docket Entry # 68). The City seeks to strike this

motion.  (Docket Entry # 73).  After conducting a hearing on January 3, 2018, this court took the motions (Docket Entry ## 59, 61, 63, 68, 73) under advisement.

<u>PROCEDURAL BACKGROUND</u>

On September 13, 2017, this court set a deadline of October 20, 2017 for the filing of dispositive motions.  (Docket Entry # 57).  On October 20, 2017, both Tully and Salach filed timely motions for summary judgment.  (Docket Entry ## 59, 61).  The City also filed a timely motion for partial summary judgment. (Docket Entry # 63).

Almost one month later, Castro filed the cross motion for summary judgment against the City.  (Docket Entry # 68).  Four days later on November 17, 2017, the City filed the motion to strike the cross motion for summary judgment on the basis that Castro's motion was untimely.  (Docket Entry # 73).  On December 1, 2017, Castro filed an opposition to the City's motion to strike.  (Docket Entry # 75).  Three days later, the City filed an opposition to Castro's cross motion for summary judgment. (Docket Entry # 76).

The parties' dispute arises out of Tully and Salach's attempted apprehension of Castro during a traffic stop.  (Docket Entry # 69-14, p. 2).  The ten-count, second amended complaint raises the following causes of action:  (1) assault and battery against Tully (Count One); (2) civil conspiracy against Salach

2

and Tully (Count Two); (3) intentional infliction of emotional
distress ("IIED") against Tully (Count Three); (4) negligent
infliction of emotional distress ("NIED") against the City
(Count Four); (5) unlawful seizure and excessive force in
violation of the Fourth and Fourteenth Amendments under 42
U.S.C. § 1983 ("section 1983") against Tully and Salach (Count
Five); (6) violation of 42 U.S.C. § 1985 ("section 1985")
against Tully and Salach (Count Six); (7) failure to screen
before hiring, failure to train, failure to supervise, and
failure to discipline against the City under section 1983 (Count
Seven); (8) violation of the Massachusetts Declaration of Rights
against Tully and Salach (Count Eight); (9) violation of the
Equal Rights Amendment of the Massachusetts constitution against
Tully and Salach (Count Nine); and (10) violation of
Massachusetts General Laws chapter 258, section two, against the
City (Count Ten).  (Docket Entry # 29).

<u>STANDARD OF REVIEW</u>

Summary judgment is designed "to 'pierce the boilerplate of
the pleadings and assay the parties' proof in order to determine
whether trial is actually required.'"  <u>Tobin v. Federal Express
Corp.</u>, 775 F.3d 448, 450 (1st Cir. 2014) (quoting <u>Wynne v. Tufts
Univ. Sch. of Med.</u>, 976 F.2d 791, 794 (1st Cir. 1992)).  It is
appropriate "if the movant shows that there is no genuine
dispute as to any material fact and the movant is entitled to

3

judgment as a matter of law." Fed. R. Civ. P. 56(a). It is inappropriate "if the record is sufficiently open-ended to permit a rational fact finder to resolve a material factual dispute in favor of either side." Pierce v. Cotuit Fire Dist., 741 F.3d 295, 301 (1st Cir. 2014).

"Genuine issues of fact are those that a fact finder could resolve in favor of the nonmovant, while material facts are those whose 'existence or nonexistence has the potential to change the outcome of the suit.'" Green Mountain Realty Corp. v. Leonard, 750 F.3d 30, 38 (1st Cir. 2014) (quoting Tropigas de Puerto Rico, Inc. v. Certain Underwriters at Lloyd's of London, 637 F.3d 53, 56 (1st Cir. 2011)). The evidence is viewed "in the light most favorable to the non-moving party" and "all reasonable inferences" are drawn in his favor. Ahmed v. Johnson, 752 F.3d 490, 495 (1st Cir. 2014). "Unsupported allegations and speculation," however, "do not demonstrate either entitlement to summary judgment or the existence of a genuine issue of material fact sufficient to defeat summary judgment." Rivera-Colón v. Mills, 635 F.3d 9, 12 (1st Cir. 2011); see Serra v. Quantum Servicing, Corp., 747 F.3d 37, 39-40 (1st Cir. 2014) ("allegations of a merely speculative or conclusory nature are rightly disregarded").

FACTUAL BACKGROUND

I.   June 15, 2013 Facts

On June 15, 2013, at approximately 5:24 a.m., Tully and Salach responded to a noise complaint regarding a loud party at 131 Bennington Street in Lawrence, Massachusetts. (Docket Entry # 69-14, p. 1). Both Salach and Tully were on duty and working a 1:00 a.m. to 9:00 a.m. work shift. (Docket Entry # 69-3, p. 45) (Docket Entry # 69-17, p. 23). Both officers were wearing Lawrence Police Department ("LPD") uniforms with their badges displayed and driving separate police cruisers. (Docket Entry # 69-14, p. 1). Because Bennington Street is a one-way street, Salach's cruiser was positioned in front of Tully's cruiser. (Docket Entry # 69-17, p. 25).

After resolving the noise complaint without incident, Salach radioed to dispatch that the call was clear. (Docket Entry # 69-3, p 48) (Docket Entry # 69-17, p. 26). Driving separate police cruisers, Salach and Tully drove to the end of Bennington Street, turned left onto Stearns Avenue, and headed toward Lawrence Street. (Docket Entry # 69-17, p. 25). While on Stearns Avenue approaching Lawrence Street, both officers heard a loud revving of a car engine emanating from Lawrence Street. (Docket Entry # 69-3, p. 49) (Docket Entry # 69-14, p. 1) (Docket Entry # 69-17, p. 26). Salach testified that the revving engine could "be construed as a noise violation." (Docket Entry # 69-5, p. 161). Following the noise of the revving car engine, Salach and Tully turned left onto Lawrence

5

Street going south.  (Docket Entry # 69-14, p. 1) (Docket Entry # 69-17, p. 26).

As the lead police cruiser, Salach observed a green Honda Civic revving its engine.  (Docket Entry # 69-14, p. 1) (Docket Entry # 69-16, p. 12) (Docket Entry # 69-17, pp. 26-27). Initially, Tully did not know what vehicle was the source of the noise.  When he turned onto Lawrence Street and positioned his cruiser, he realized it was the Honda.  (Docket Entry # 69-3, pp. 49, 54-55).  The Honda was driving down Lawrence Street approaching Salach and Tully's cruisers and, as stated by Castro, he was driving the speed limit.[1]  (Docket Entry # 69-3, p. 49) (Docket Entry # 69-14, p. 1) (Docket Entry # 69-17, p. 26) (Docket Entry # 69-6, p. 73).  Salach and Tully positioned their cruisers on Lawrence Street to block traffic in their direction with Tully's cruiser behind Salach's cruiser.  (Docket Entry # 69-14, p. 1) (Docket Entry # 69-17, p. 30) (Docket Entry # 69-3, pp. 52-53).  Salach activated his police cruiser's blue lights.  (Docket Entry # 69-14, p. 1) (Docket Entry # 69-17, p. 26).  Tully also activated his police cruiser's blue lights. (Docket Entry # 69-3, pp. 53, 55-56).  Neither Salach nor Tully turned on his police cruiser's siren.  (Docket Entry # 69-3, pp.

---

[1]  Castro testified that he "was driving the speed limit" when he saw the two cruisers facing south on Lawrence Street and blocking the street.  (Docket Entry # 69-6, p. 73).  The record, of course, is construed in Castro's favor.

53-54).  The Honda was driven by Castro.  (Docket Entry # 69-6,
p. 72) (Docket Entry # 69-14, p. 2).  The vehicle had a New
Hampshire license plate with the number 3460602 and was
registered to Adriana O'Donoghue of Salem, New Hampshire.
(Docket Entry # 69-14, p. 2).  Castro was a light-skinned,
Hispanic male with short, dark hair.  (Docket Entry # 69-14, p.
2).

Castro's vehicle approached Salach and Tully's location at
the end of Lawrence Street and stopped in front of their police
cruisers.  (Docket Entry # 69-6, p. 73) (Docket Entry # 69-14,
p. 2) (Docket Entry # 69-17, p. 31).  Upon stopping and with the
cruisers' lights still activated, Castro then began to reverse
the Honda back down Lawrence Street.  (Docket Entry # 69-6, p.
74) (Docket Entry # 69-14, p. 2) (Docket Entry # 69-5, p. 166)
(Docket Entry # 69-17, pp. 31, 55-56).  Castro testified that he
reversed down Lawrence Street because he had "seen a hand
movement from afar."[2]  (Docket Entry # 69-6, p. 73).  Tully did

---

[2]  Salach, however, testified that he had made "no hand signals
or motions" to Castro as Castro approached Tully and him on
Lawrence Street.  (Docket Entry # 69-17, p. 33).  Salach did not
know if Tully had made any motions or hand signals to Castro.
(Docket Entry # 69-17, p. 33).  Tully testified that, as Castro
was slowing his car to a stop, neither Tully nor Salach provided
Castro with any direction.  (Docket Entry, 69-3, p. 55).
Construing the record in Castro's favor, as required, and in
light of his testimony, Castro saw a hand movement from afar.

not provide Castro any instructions from the loud speaker in his
police cruiser.  (Docket Entry 69-5, p. 115).

   According to both Tully and a Crashteams Southern New
England ("CSNE") official report, Castro was travelling in
reverse at a high rate of speed.  (Docket Entry # 69-3, p. 56)
(Docket Entry # 69-14, p. 2) (Docket Entry # 69-5, pp. 84-85).
Salach did not know the approximate speed of the Honda as it
travelled in reverse (Docket Entry # 69-17, p. 32) although he
described the car as reversing "at a high rate of speed" (Docket
Entry # 69-5, p. 15).  More specifically, in the incident report
Salach prepared, he wrote that, "the driver backed up at a high
rate of speed."  (Docket Entry # 69-15).  Salach also testified
that the Honda was weaving and "going back and forth in front of
[him]."  (Docket Entry # 69-17, p. 34) (Docket Entry # 69-5, p.
149).  Both Salach and Tully started driving their police
cruisers and following Castro's reversing vehicle as it passed
two intersecting streets.  (Docket Entry # 69-3, p. 57) (Docket
Entry # 69-14, pp. 2, 5) (Docket Entry # 69-17, p. 33).  At or
around this time, Salach radioed in the license plate number to
dispatch.  (Docket Entry # 69-5, p. 144) (Docket Entry # 69-14,
p. 5).  As Castro was reversing down Lawrence toward Bennington
Street, Tully passed Salach and attempted to pass Castro on the
passenger side of Castro's reversing vehicle.  (Docket Entry #
69-3, pp. 56-57) (Docket Entry # 69-16, p. 3) (Docket Entry #

69-14, p. 2).  Tully testified that he "attempted to pass Castro

to warn any oncoming traffic that he was coming at them in

reverse."  (Docket Entry # 69-3, p. 57).

As Tully attempted to pass Castro, Tully and Castro's

vehicles collided on Lawrence Street.  (Docket Entry # 69-14, p.

2) (Docket Entry # 69-6, p. 79).  According to the CSNE report,

it is "not possible to determine whether the Crown Victoria

operated by Officer Tully made first contact with the Honda

operated by Castro or whether the Honda swerved and made first

contact with the Crown Victoria."  (Docket Entry # 69-16, p.

12).  The CSNE report also found that "there were at least two

separate contacts between the vehicles."  (Docket Entry # 69-16,

p. 4).

As stated in the CSNE report, the first contact between

Tully and Castro's vehicles was a "sideswipe" of the

"passenger's side front quarter" of Castro's Honda and the

"passenger's side front bumper" of Tully's police cruiser.

(Docket Entry # 69-16, p. 4).  The second contact was between

the "right rear quarter" of Castro's vehicle and the "right

front" of Tully's police cruiser.  (Docket Entry # 69-16, p. 4).

The second contact resulted in "more significant" damage to the

Honda.  (Docket Entry # 69-16, p. 4).

According to the CSNE report, Tully admitted "that he

rammed the Honda."  (Docket Entry # 69-16, p. 6).  Tully further

testified at his deposition that, once Castro and he made contact, Tully "turned [his] steering wheel into [Castro's vehicle] and [they] remained in contact because [Tully] pushed [Castro] back to the southbound lane out of the northbound lane" on Lawrence Street and onto the traffic island. (Docket Entry # 69-3, pp. 69-70). Castro and Tully's vehicles went over the curb and temporarily stopped on a Bennington Street traffic island. (Docket Entry # 69-14, p. 2). Both Castro and Tully's vehicle were in constant contact with the other. (Docket Entry # 69-14, p. 2) (Docket Entry # 69-17, p. 40). At his deposition, Salach testified that Tully and Castro's vehicles "appeared to be locked together from the collision." (Docket Entry # 69-17, p. 42).

As Castro and Tully's interlocked vehicles went onto the Bennington Street traffic island, Salach drove his police cruiser alongside Castro's vehicle to prevent Castro from driving away and escaping. (Docket Entry # 69-14, p. 2). Salach was "nose to nose" with Castro's vehicle. (Docket Entry # 69-17, p. 42). There were other vehicles parked on the traffic island, including behind the Honda. (Docket Entry # 69-17, p. 42). The Bennington Street traffic island was covered in gravel. (Docket Entry # 69-3, p. 45). Castro testified that he was unable to turn left, right, or reverse because of the positions of Salach and Tully's police cruisers. (Docket Entry

# 69-6, p. 82).   Salach observed that Castro was "revving his engine, spinning his tires, [and] trying to break free from being locked together with Officer Tully's cruiser."   (Docket Entry # 69-17, p. 42).

With the vehicles in contact on the traffic island, Tully exited his cruiser.   (Docket Entry # 69-3, p. 61) (Docket Entry # 69-14, p. 2) (Docket Entry # 69-17, p. 42).   Upon exiting his cruiser, Tully started going around the back of Castro's vehicle to its driver's side.   (Docket Entry # 69-3, pp. 43, 72).   As Tully exited his police cruiser, he drew his service weapon, a Sig Sauer P226, .40 caliber pistol, and placed his trigger finger alongside the trigger guard rather than on the trigger.[3] (Docket Entry # 69-3, pp. 43-44) (Docket Entry # 69-5, p. 176) (Docket Entry # 69-14, p. 2).   As Tully was moving around Castro's vehicle, Salach placed his police cruiser into park and attempted to exit his vehicle.   (Docket Entry # 69-17, p. 43).

Salach testified that before he was able to exit his vehicle, Castro was able to free his car from being attached to Tully's cruiser.   (Docket Entry # 69-17, p. 43).   Upon disengaging from Tully's cruiser, Castro drove by the passenger side of Salach's cruiser, went over the curb, and headed north

---

[3]   Tully testified that he drew his weapon when he was in back of the Honda.   (Docket Entry # 69-3, p. 72).   The record, however, is construed in Castro's favor.

11

toward Methuen.  (Docket Entry # 69-14, p. 2).  Castro testified
that he had "seen [Tully] in [his] blind spot" and drove
forward.  (Docket Entry # 69-6, p. 83).  From Salach's
perspective, Castro "reversed far enough to be able to drive
around [Salach's police cruiser] on the sidewalk, pass west of
Salach, [and get] back onto Lawrence Street and head north."
(Docket Entry # 69-17, p. 43).  After seeing Castro's car
reverse and then proceed around his cruiser, Salach saw Tully
standing where the rear of the Honda had been with his firearm
drawn.  (Docket Entry # 69-17, pp. 43-45).

        While moving around the rear of the Honda and with a
vehicle behind him, Tully saw the Honda backing up toward him.
(Docket Entry # 69-14, p. 7) (Docket Entry # 69-3, p. 61).
Tully testified that, "in [his] position, where [he] was,
[Castro] was absolutely trying to kill [him]."  (Docket Entry #
69-3, p. 78).  As Tully attempted to run out of the way of
Castro's reversing vehicle, he lost his balance.  (Docket Entry
# 69-3, pp. 61-62).  Tully testified that he lost his balance
because he was running on the traffic island's gravel.  (Docket
Entry # 69-3, p. 45).

        As Tully stumbled on the gravel, his finger pulled the
trigger of his service weapon and fired one round.  (Docket
Entry # 69-3, p. 45).  At that instant, however, Tully testified
that he did not know that he had fired his service weapon.

(Docket Entry # 69-3, p. 61).  Both Salach and Tully heard a
"pop" sound the moment the round was fired.  (Docket Entry # 69-
3, p. 62) (Docket Entry # 69-17, p. 44).  Salach was "not sure"
what had caused the "pop" sound.  (Docket Entry # 69-17, p. 44).
Tully believed the "pop" sound was Castro's tire deflating.
(Docket Entry # 69-3, p. 62).  Castro, however, "heard a loud
bang."  (Docket Entry # 69-6, p. 83).  Following the sound,
Castro felt "a hot liquid feeling" coming down his back.
(Docket Entry # 69-6, p. 83).  Castro grabbed his back and
noticed that he was bleeding.  (Docket Entry # 69-6, p. 83).

    In a later debriefing with Massachusetts State Police
Detective Lieutenant Norman Zuk ("Zuk"), Tully described that he
"was wearing padded mechanics gloves."  (Docket Entry # 69-14,
p. 9).  He also described how "the gloves are padded in the palm
and fingers and could have been the reason why he did not
realize that his service weapon had been discharged."  (Docket
Entry # 69-14, p. 9).  Salach testified that he has not noticed
a "significant difference" when firing his service weapon with
or without gloves.  (Docket Entry # 69-17, p. 51).  He further
testified that he had never accidentally fired his service
weapon.  (Docket Entry # 69-17, p. 48).

    According to the CSNE report, the bullet entered Castro's
vehicle through the "upper right trunk lid."  (Docket Entry #
69-16, pp. 8, 12).  The bullet traveled through the "back of the

trunk, through the rear of the back seat, [and] through the
front of the back seat." (Docket Entry # 69-16, pp. 9, 10, 12).
The ballistics team "located the entry hole in the back of the
driver's seat" and determined that the bullet entered Castro's
vehicle at a reading of "eight degrees right of center."
(Docket Entry # 69-16, p. 12).

Tully testified that, at the moment he discharged his
firearm, the discharge was accidental. (Docket Entry # 69-4, p.
18). Tully also testified, however, that he "had every
intention of firing at [Castro's] vehicle at that point."
(Docket Entry # 69-3, p. 78). Tully testified that he would
have intentionally fired his service weapon "if [Castro]
continued back at [Tully], or turned [Castro's] vehicle towards
[Tully]." (Docket Entry # 69-3, p. 79). Tully further
explained that he would have "fired [his] weapon had [he] not
been stumbling." (Docket Entry # 69-3, p. 80). As stated
during his deposition, "had [Tully] stood [his] ground [,] [he]
would have fired [his] weapon." (Docket Entry # 69-3, p. 80).

Following Tully discharging his firearm and Castro driving
north, Salach backed up his police cruiser and attempted to
pursue Castro. (Docket Entry # 69-17, p. 45). Salach initially
followed Castro down Lawrence Street but lost sight of him once
Castro drove down a hill on Lawrence Street into Methuen.
(Docket Entry # 69-17, pp. 45-46). As reflected in the CSNE

repost, Salach "gave chase until he reached Tenney Street in
Methuen at which time he lost sight of the Honda." (Docket
Entry # 69-14, p. 5).  Salach and Tully, who had gotten into his
cruiser in search of Castro, briefly searched the area.  (Docket
Entry # 69-17, p. 46) (Docket Entry # 69-3, p. 64) (Docket Entry
# 69-14, p. 7).

     Tully, as well as Salach, reported the cruiser accident.
(Docket Entry # 69-3, pp. 62-63).  Tully also reported that
Castro "couldn't have gotten very far, there was damage to his
car and [Tully] believed [Castro] had a flat tire at that
point." (Docket Entry # 69-3, p. 62).

     Unable to locate the Honda, Tully returned to the accident
scene and met Sergeant Robert Michaud ("Michaud"), Tully and
Salach's supervisor.  (Docket Entry # 69-14, p. 7) (Docket Entry
# 69-3, p. 64).  Tully explained how the accident occurred to
Michaud, who advised him to "pick up a piece of [Castro's] car
that was in the middle of Lawrence Street." (Docket Entry # 69-
3, pp. 64-65).  Tully put the piece of Castro's car back into
his "cruiser to bring it back as possible evidence." (Docket
Entry # 69-3, p. 65).  During this time, Tully did not take any
pictures of the Bennington Street traffic island. (Docket Entry
# 69-3, p. 65).

     After returning to Lawrence, Salach radioed Tully, asked
for his location, and the two reunited at the Lawrence police

station.  (Docket Entry # 69-17, p. 46).  At the station, Salach
asked Tully if he had discharged his service weapon.  (Docket
Entry # 69-17, p. 46).  At that time, Tully responded that he
had not fired his service weapon.  (Docket Entry # 69-17, p.
46).

Meanwhile, the Honda's license plate "came back to an
address on Lancelot Court in Salem, New Hampshire."  (Docket
Entry # 69-14, p. 3).  Lieutenant Steven Scheffen ("Scheffen"),
the LPD commanding officer for the 1:00 a.m. to 9:00 a.m. shift,
sent Michaud to Salem "to meet up with the Salem Police
Department to attempt to locate the driver of the Honda Civic."
(Docket Entry # 69-14, p. 3).  Michaud was on his way to Salem
when he radioed to Tully and Salach to see if they could
identify Castro.  (Docket Entry # 69-17, p. 52).  Salach
responded to Michaud that he would be able to identify Castro.
(Docket Entry # 69-17, p. 52).  Michaud therefore told Salach to
"go to Salem, New Hampshire to see if he could identify
[Castro]."  (Docket Entry # 69-14, p. 5).  Accordingly, Salach
started driving to 6 Lancelot Court in Salem, New Hampshire.
(Docket Entry # 69-17, p. 52).

After the incident, Castro also drove to 6 Lancelot Court
in Salem.  (Docket Entry # 69-6, p. 85).  He testified that,
when he had arrived at 6 Lancelot Court, he felt dizzy, hot, and
very weak.  (Docket Entry # 69-6, p. 85).  When Castro's

girlfriend opened the car door for Castro, he was unable to stand. (Docket Entry # 69-6, p. 85). Castro's girlfriend left Castro in the car and he began vomiting. (Docket Entry # 69-6, p. 85). Eventually, he went to Lawrence General Hospital, where Michaud placed him under arrest for recklessly or negligently operating a vehicle to endanger the public in violation of Massachusetts General Laws chapter 90 ("chapter 90"), section 24(2)(a) ("section 24").[4] (Docket Entry # 69-6, p. 86) (Docket Entry # 69-14, pp. 2-3). Tully's bullet was still inside Castro two years later during the criminal trial in June 2015. (Docket Entry # 69-6, p. 86).

When Salach arrived at 6 Lancelot Court in Salem, he observed Castro surrounded by medical personnel. (Docket Entry # 69-17, p. 53). Salach testified that medical personnel "were working on Castro's back." (Docket Entry # 69-14, p. 5). Michaud subsequently told Salach that Castro was being treated for a gunshot wound. (Docket Entry # 69-14, p. 5). Salach identified Castro as the driver of the Honda. (Docket Entry # 69-17, p. 53).

Salach waited at 6 Lancelot Court before being relieved a few hours later by another Lawrence police officer. (Docket Entry # 69-17, p. 53). Salach testified that the reason he left

---

[4]  Michaud also arrested him for a number of other charges.

"was because [he] was ordered to go meet with Captain Dennis
Pierce ('Pierce') at the [Bennington Street] traffic island"
back in Lawrence.  (Docket Entry # 69-17, p. 53).  Salach
returned to the Bennington Street traffic island and encountered
Pierce and other Massachusetts state police officers.  (Docket
Entry # 69-17, p. 53).

Pierce asked Salach where Tully was standing once Salach
had driven away in pursuit of Castro.  (Docket Entry # 69-17, p.
54).  Salach indicated where he believed Tully was standing at
the time Salach drove away.  (Docket Entry # 69-17, p. 54).  The
Massachusetts state police officers searched for Tully's
expended shell casing but were unable to find any expended shell
casings on the Bennington Street traffic island.  (Docket Entry
# 69-17, p. 54).

Meanwhile, while Salach was in Salem, Scheffen called Tully
into the Lawrence police station to ask him what had happened.
(Docket Entry # 69-14, p. 3).  Scheffen asked to see Tully's
service weapon.  (Docket Entry # 69-3, p. 63) (Docket Entry #
69-14, p. 4).  Scheffen "noticed that there was a round missing
and that [the service weapon] smelled as if it had been recently
fired."  (Docket Entry # 69-14, p. 4).  Scheffen took possession
of Tully's service weapon.  (Docket Entry # 69-14, p. 4).

At no time did Tully write a report regarding the shooting
or file an accident report.  (Docket Entry # 69-3, pp. 66-67).

18

Tully did state that he "gave an oral report to Lieutenant Zuk."
(Docket Entry # 69-3, p. 68).  Tully also explained that he did
not write a report because he "was sent up to Lawrence General
Hospital." (Docket Entry # 69-3, p. 67).  Tully was sent to the
hospital because of high blood pressure.  (Docket Entry # 69-3,
p. 67).  Additionally, Tully testified that, "he was put on
drugs at the hospital so [he] was driven home and then [he] was
put on administrative leave." (Docket Entry # 69-3, p. 67).
Tully acknowledged that LPD policy "says that [officers] write a
report" when they are in a "cruiser-involved accident." (Docket
Entry # 69-3, p. 68).

II.  Relevant LPD Policies

A.  Firearms Policy

     Regarding LPD policies, Lawrence police officers are
authorized to "use deadly force in the exercise of their service
to society." (Docket Entry # 69-7, p. 12).  Officers are only
allowed to use deadly force, however, "as a means of last resort
to protect themselves and others from the immediate threat of
death or serious physical injury." (Docket Entry # 69-7, p.
12).  An officer is allowed to defend himself "from any unlawful
attack which he reasonably perceives as an immediate threat of
death or serious physical injury." (Docket Entry # 69-7, p.
12).  As stated in the firearms policy, anytime a Lawrence

police officer uses deadly force he or she "shall file an
incident report." (Docket Entry # 69-7, p. 13).

Discharging a firearm constitutes deadly force. (Docket
Entry # 69-8, p. 1). The LPD policy "mandates that [firearms]
be used discriminately and within clearly defined limits."
(Docket Entry # 69-8, p. 1). Within these limits, "officers
shall not point a firearm at a person unless he/she has reason
to believe there is a threat of death or serious bodily injury,
either to him/herself or another." (Docket Entry # 69-8, p. 3).
The policy further provides that a Lawrence police officer
"shall never brandish a firearm, nor remove a firearm from its
holster, other than in the proper performance of duty." (Docket
Entry # 69-8, p. 3). The policy also recognizes "the danger of
discharging the firearm while running or jumping due to the
possibility that other persons or property may be struck by the
projectile." (Docket Entry # 69-8, p. 4). Discharging a
firearm at a "moving automobile is prohibited, unless there is
imminent danger of death or serious injury to the officer, and
there are no means of escape," according to the policy. (Docket
Entry # 69-8, p. 5).

Furthermore, the policy states that Lawrence police
officers "shall qualify at least once a year using the firearm
they are authorized to carry on duty and will follow a
reasonable period of practice and training under the direction

of the Training Officer." (Docket Entry # 69-8, p. 3). The
firearms policy further states that "qualification is on a
pass/fail basis with a minimum passing score of 80%." (Docket
Entry # 69-8, p. 3). The LPD requires that, "when an officer is
issued a new weapon, he/she shall qualify in the use of that
weapon prior to the officer resuming street duties." (Docket
Entry # 69-8, p. 3).

According to LPD's policy of reporting firearms discharges,
"whenever an officer discharges a firearm, on-duty or off-duty,
the officer and his/her immediate supervisor will submit a
detailed report of the circumstances as soon as possible after
the incident to the Chief of Police and the officer's Division
Commander." (Docket Entry # 69-8, p. 6). The policy also notes
that, any firearm discharge will cause "Internal Affairs, or
other persons designated by the Chief, [to] review all reported
incidents involving the discharging of a firearm by an officer,
both on and off-duty." (Docket Entry # 69-8, p. 6).

When a firearm is discharged "resulting in death or bodily
injury to a person," the officers involved with the shooting
must notify the dispatcher and if necessary, summon an
ambulance, according to the policy. (Docket Entry # 69-8, p.
7). The policy further states that the dispatcher will then
"notify the Official-in-Charge and the Patrol Supervisor."
(Docket Entry # 69-8, p. 7). The policy reflects that LPD will

conduct a "thorough and objective investigation," which will "be initiated immediately and completed as soon as possible." (Docket Entry # 69-8, p. 7).

B.  Pursuit Policy

In addition to the firearms policy, the Lawrence Police Department Manual of Procedure ("the manual") sets out policies regarding vehicular pursuits.  (Docket Entry # 69-7, p. 26). Under these policies, a pursuit is defined as, "[T]he active attempt by a police officer in an authorized emergency vehicle to apprehend the occupants of a moving motor vehicle whom [sic] are in the process of attempting to evade capture by traveling at speeds greater than the speed limit."  (Docket Entry # 69-7, p. 28).  In addition, the policy states that, "No officer will undertake a pursuit in a vehicle that is not equipped with both emergency lights and a siren."  (Docket Entry # 69-7, p. 28) (capitalization omitted).  If a Lawrence police officer engages in a pursuit, the officer shall "submit an incident report giving a full account of the pursuit and the reasons for his participation," according to the policy.  (Docket Entry # 69-7, p. 38).

The policy sets out certain restrictions to vehicular pursuits.  (Docket Entry # 69-7, p. 26).  Vehicular pursuits are only authorized for "the attempted apprehension of persons wanted for the commission of felonious acts that have

22

threatened, or will threaten the health, life, or safety of
persons," and "the attempted apprehension of persons wanted for
the commission of certain, 'high priority' felonies." (Docket
Entry # 69-7, p. 26). The LPD does not "authorize the pursuit
of a motor vehicle operator who has committed only motor vehicle
violations including but not limited to minor motor vehicle
violations, O.U.I, and reckless operation." (Docket Entry # 69-
7, p. 26).

   The policy expressly prohibits "the ramming of a suspect
vehicle with a police cruiser." (Docket Entry # 69-7, p. 32).
In addition, "vehicles being pursued should not be passed or
overtaken by the police unit, as the maneuver is tactically ill
advised and often precipitates aggressive maneuvering by the
suspect vehicle." (Docket Entry # 69-7, p. 32). Furthermore,
"discharging a firearm at a moving vehicle by an officer is
prohibited," according to the policy. (Docket Entry # 69-7, p.
32). The policy allows an exception for the officer to "defend
himself or another when the occupants of the vehicle are
employing deadly force, which the officer reasonably perceives
as an immediate threat of death or serious bodily injury" to
himself or others. (Docket Entry # 69-7, p. 32).

   Finally, the policy prohibits "the deliberate contact
between vehicles or forcing the pursued vehicle into parked cars
or off of the roadway, into ditches, or other obstacles, or

'boxing in' (a moving vehicle) or driving alongside the pursued vehicle." (Docket Entry # 69-7, p. 33). The policy further provides that a Lawrence police officer pursuing a suspect's vehicle "shall not duplicate [the] reckless or hazardous driving maneuvers of the suspect." (Docket Entry # 69-7, p. 33). However, "if at any time during the pursuit the suspect vehicle comes to a complete stop it is appropriate to 'box in' and thus prevent the escape of the suspect vehicle." (Docket Entry # 69-7, p. 33).

C.   Traffic Accident Policy

Under LPD's traffic accident policy, Lawrence police officers are required to complete an accident report when: "(1) a person is injured; (2) damage to any vehicle exceeds $1,000; (3) damage to any public property owned by the city of Lawrence; and (4) the accident involves any vehicle owned by the City of Lawrence." (Docket Entry # 69-7, p. 39). Furthermore, Lawrence police officers who are "involved in a cruiser accident shall prepare and complete an R.M.V. Operator's report at or before the conclusion of the tour." (Docket Entry # 69-7, p. 42). As stated in the policy, the officer involved in the accident shall "forward a copy of said report to the investigating Superior Officer, the Director of Communications and Facilities, and the civilian clerk responsible for cataloging accident reports." (Docket Entry # 69-7, p. 42).

D.   Preservation of Crime Scene Evidence

    The manual sets out a number of parameters or policies
applicable to the preservation of evidence at a crime scene.
Thus, the manual explains that, the "identification, collection,
and preservation of physical evidence [is] a critical function
of the Department's efforts towards solving criminal acts."
(Docket Entry # 69-7, p. 56).  In order to preserve a crime
scene, "officers shall ensure that the scene remains undisturbed
by refusing access to unnecessary personnel."  (Docket Entry #
69-7, p. 56).  No officer or person "should be allowed to pick
up or place anything in the crime/incident scene area,"
according to the policy.  (Docket Entry # 69-7, p. 56).  The
manual explains that, "any contamination of the scene can
greatly reduce the effectiveness of the Department in
successfully processing the scene."  (Docket Entry # 69-7, p.
56).

    The manual also instructs that evidence at crime scenes
"should only be collected after it has been photographed,
identified on the crime scene sketch, and measured to other
items of evidentiary value and fixed objects."  (Docket Entry #
69-7, p. 57).  A photographic log "will be maintained, noting
the date, time, location, and case/incident number to each
photograph taken."  (Docket Entry # 69-7, p. 58).  The policy
notes that, after photographing and processing the evidence,

25

"[t]he detective responsible for processing the crime/incident scene shall submit a detailed report of the investigation to his supervisor as soon as possible."  (Docket Entry # 69-7, p. 59).

E.   Other policies

Under section one of the general rules and regulations in the manual, "it shall be the duty of every member of the Department to thoroughly familiarize himself with the provisions of the Rules and Regulations of the Department within 30 days after issuance of a copy of the rules."  (Docket Entry # 69-7, p. 66).  Officers must "be truthful at all times whether under oath or not."  (Docket Entry # 69-7, p. 66).  Furthermore, "no member of the Department shall make false official reports or knowingly enter or cause to be entered in any department books or records, any inaccurate, false or improper 'bookings' or registration of police information or matter."  (Docket Entry # 69-7, p. 71).  When an officer responds to a call, that officer "shall immediately on completion of the call, notify the Office in Charge of the nature of the call and of the action taken." (Docket Entry # 69-7, p. 73).  Finally, "any change in domestic status while in the Department with reference to marriage, divorce, or separation" must be reported to the Chief.  (Docket Entry # 69-7, p. 74).

III.   Chief James Fitzpatrick's Testimony

During a Fed. R. Civ. P. 30(b)(6) deposition, Chief James Fitzpatrick ("Fitzpatrick") testified how LPD general orders are incorporated into the manual. (Docket Entry # 69-1, p. 11). Fitzpatrick testified that, a "general order is a standing order that has no expiration." (Docket Entry # 69-1, p. 11). He also explained that general orders "become part of the policy and procedure manual of the department." (Docket Entry # 69-1, p. 12). Once a general order is incorporated into the manual, the general order is "sent out and then it's incorporated into the manual." (Docket Entry # 69-1, p. 14).

Because the update is done electronically, all members of the LPD immediately have access to the new policies and procedures. (Docket Entry # 69-1, p. 140). In addition, Fitzpatrick testified that the updated policies and procedures are "placed on bulletin boards in two locations and emailed to every officer, [and] read [during] the roll calls." (Docket Entry # 69-1, p. 14). He also noted that Lawrence police officers can access the most current policies and procedures manual through the LPD's website. (Docket Entry # 69-1, p. 15). Although Lawrence police officers are not currently "issued print copies of the manual," a "PDF is sent to them through email," according to Fitzpatrick. He also testified that officers "going outside of a policy or procedure can result in discipline." (Docket Entry # 69-1, p. 17).

Fitzpatrick reaffirmed the aforementioned policies regarding when a Lawrence police officer is permitted to discharge his firearm. (Docket Entry # 69-1, p. 18). Fitzpatrick reaffirmed the foregoing policy that an officer must make a judgment whether his "life is in imminent risk or someone else's life is in imminent risk, before he is authorized to discharge his weapon." (Docket Entry # 69-1, p. 18). Fitzpatrick affirmed that in using force, an officer "has to make a conscious decision." (Docket Entry # 69-1, p. 19). Fitzpatrick further stated that an officer's use of force would not "be consistent with the policies and procedures of the department if the officer says [he] accidentally discharged [his] weapon." (Docket Entry # 69-1, p. 20). Fitzpatrick testified that the LPD firearms policy does not consider the accidental discharge of a firearm a lawful and proper use of force. (Docket Entry # 69-1, p. 19).

In discussing the actual shooting of a firearm, Fitzpatrick, who started at the LPD as a police officer, testified that he has never "had an instance where [he] discharged [his] weapons without knowing [he] had discharged it." (Docket Entry # 69-1, p. 26). Fitzpatrick did testify, however, that there might be some instances where someone shooting a firearm would not necessarily feel the recoil of the weapon. (Docket Entry # 69-1, p. 26). Fitzpatrick testified

28

that in a loud environment it could be possible for the shooter
not to have heard or felt a firearm discharge.  (Docket Entry #
69-1, p. 33).  Fitzpatrick emphasized that Lawrence police
officers are trained to "index [their] finger" along the frame
of the firearm before placing their finger on the firearm's
trigger.[5]  (Docket Entry # 69-1, p. 27).

Fitzpatrick also testified that wearing gloves would not
interfere with an officer's ability to safely handle his
firearm.  (Docket Entry # 69-1, p. 27).  Fitzpatrick
acknowledged there is a danger of an officer discharging his
firearm while "running or jumping."  (Docket Entry # 69-1, p.
30).  Fitzpatrick reiterated that an officer would violate the
LPD policies and procedures by not filing a report after the
officer discharged his firearm.  (Docket Entry # 69-1. p. 31).
When an officer-involved shooting occurs, Fitzpatrick affirmed
that it is the general policy of the LPD that the incident be
"investigated by the state police rather than by the
department."  (Docket Entry # 69-2, p. 12).

Regarding vehicular pursuits and accidents, Fitzpatrick
testified that the overtaking of a suspect's vehicle "could
create an unsafe environment" and "risk of causing a further

---

[5]  Tully's description of placing his trigger finger alongside
the trigger appears to comply with this aspect of the above
policy.

29

accident." (Docket Entry # 69-1, p. 35). Furthermore,
"Offensive Tactics," as described in the manual, are prohibited.
(Docket Entry # 69-1, p. 36). The "ramming" of a suspect's
vehicle is also prohibited. (Docket Entry # 69-1, p. 35).
Fitzpatrick noted that Lawrence police officers are supposed to
keep their distance in a pursuit and a written report is
required for all pursuits and vehicular accidents. (Docket
Entry # 69-1, pp. 36-37).

Addressing the June 15, 2013 incident, Fitzpatrick agreed
that what occurred at the Bennington Street traffic island would
be considered a "crime scene." (Docket Entry # 69-1, p. 42).
Fitzpatrick affirmed that any evidence found at the crime scene
would need to be preserved. (Docket Entry # 69-1, p. 42). In
addition, photographs would be required of the crime scene at
the time of the incident. (Docket Entry # 69-1, p. 42).
According to the policy, Fitzpatrick affirmed that "it would
have been appropriate for a supervisor to arrive on the scene
and secure the scene." (Docket Entry # 69-1, p. 44). Before
the supervisor arrived, however, the burden would be on the
officers already present to preserve the crime scene. (Docket
Entry # 69-1, p. 45).

Lawrence police officers can be punished for violating the
above-described policies and procedures. (Docket Entry # 69-2,
p. 32). As Fitzpatrick testified, in the case of an officer

violating a particular policy, he is "guided by a review and a
thorough investigation of the circumstances." (Docket Entry #
69-2, p. 32). If a violation is found, Fitzpatrick has
additional options outside of only disciplining the officer.
(Docket Entry # 69-1, p. 32). Fitzpatrick testified that the
officer may be subject to other "corrective measures." (Docket
Entry # 69-2, p. 32). These corrective measures may include
"retraining [or] additional training" for the officer. (Docket
Entry # 69-2, p. 32).

In the last four years, Fitzpatrick testified that he could
"remember maybe four or five" excessive force complaints against
the LPD. (Docket Entry # 69-2, p. 39). Two of those complaints
dealt with "force outside of policy or in violation of policy."
(Docket Entry # 69-2, p. 40). In response to these complaints,
Fitzpatrick testified that "in both instances those
investigations were self-initiated by the police department.
They weren't based on citizen complaints." (Docket Entry # 69-
2, p. 40).

As to the other two or three excessive force complaints,
one was "internally reported by a supervisor." (Docket Entry #
69-2, p. 40). The other was brought to the department's
attention "via Facebook." (Docket Entry # 69-2, p. 40). As to
these two complaints, Fitzpatrick testified that "neither of the
two people that were subjected to the force came forward."

(Docket Entry # 69-2, p. 40).  In these cases, the department investigated "the facts and circumstances that [they] could discover."  (Docket Entry # 69-2, p. 40).  After the investigation, Fitzpatrick "deemed that those [complaints] were outside of policy."  (Docket Entry # 69-2, p. 40).

IV.  <u>Tully's Background</u>

Tully served ten years in the United States Air Force from 1986 to 1996.  (Docket Entry # 69-3, p. 8).  After leaving the Air Force, Tully became a Wilmington police officer.  (Docket Entry # 69-3, p. 8).  Tully served as a Wilmington police officer from 1996 to 2005.  (Docket Entry # 69-3, p. 9-10).  Tully "has been continuously employed" as a Lawrence police officer from 2005 to 2017 and suffers from "high blood pressure."  (Docket Entry # 69-3, pp. 7, 10).

Tully affirmed that he is "familiar with the policies and procedures of the Lawrence Police Department."  (Docket Entry # 69-3, p. 10).  Although Tully testified that he was "never issued a set of policies and procedures regarding [his] function as a police officer" in 2005 when he joined the LPD, he received the most current policies via email in 2016.  (Docket Entry # 69-3, p. 11).  Tully testified that the policies and procedures are posted in the front desk area of the Lawrence police station.  (Docket Entry # 69-3, p. 11).  Additionally, Tully testified that the officers are "told at roll call [when] an

order had come out and [was] posted up on the board." (Docket
Entry # 69-3, p. 15).

Tully acknowledged that he has violated the "detail" policy
in the past. (Docket Entry # 69-3, pp. 15-16). In particular,
Tully testified that he "was working nightclubs and a club would
pay [him] cash as opposed to a check, and [he] would go and get
a money order and turn the money order in." (Docket Entry # 69-
3, p. 150). Tully continued that he "was just under the
impression that the department wanted some type of check, but
apparently [it] wanted a check from the nightclub establishment
and not a money order from the 7-Eleven next door." (Docket
Entry # 69-3, p. 16). Tully testified that he had violated that
policy "six times." (Docket Entry # 69-3, p. 16).

Tully also admitted to having delayed turning in "money
orders" from the additional details he was working until "the
following pay period." (Docket Entry # 69-3, p. 29). Tully
testified that the reason for the delay was that he "was going
through a divorce at the time and [he] was working overtime and
details, so [he] would turn the details in for one period and
the overtime for another." (Docket Entry # 69-3, p. 29). Tully
admitted that he had done this to keep his "income stable rather
than have it appear higher." (Docket Entry # 69-3, p. 29).

An additional violation occurred when Tully reported for a
detail "that was not assigned by the detail officer." (Docket

Entry # 69-3, p. 30).  Tully testified that he had told the club owner that the club owner could call him if the club owner was "in an emergency or if it's a crowd situation." (Docket Entry # 69-3, p. 30).  At the time, Tully did not know that working a detail not assigned by the detail manager violated LPD policy. (Docket Entry # 69-3, p. 31).  Tully admitted that he "was corrected" and now knows that such actions "violated the detail policies and procedures." (Docket Entry # 69-3, p. 31).

During his deposition, Tully testified that he did not have "any problem with Hispanic individuals" or "African-American individuals." (Docket Entry # 69-3, p. 41).  Tully testified that he had never "used any derogatory phrases to refer to Hispanic individuals or Latino individuals." (Docket Entry # 69-3, pp. 41-42).

<u>DISCUSSION</u>

I.  <u>Count Two:  Civil Conspiracy Against Salach and Tully</u>

In Count Two for civil conspiracy, Castro contends that Salach and Tully "conspired to unlawfully seize Castro, box Castro's car in, ram Castro's car, force Castro's car off the road, and restrain his freedom of movement so Tully could shoot him." (Docket Entry # 29, p. 17).  The second amended complaint further alleges that Tully and Salach unlawfully seized Castro and that Tully "fired his weapon" at Castro. (Docket Entry # 29, pp. 17-18).  Tully argues that he was the "only person that

34

[Castro] alleges committed a civil tort in this action" and
"therefore there cannot be any conspiracy with another person."
(Docket Entry # 60, p. 8).  Noting an absence of "concerted
action," Salach argues that neither he nor Tully had a "meeting
of the minds" regarding Tully's shooting of Castro or that
Salach engaged in an "overt act" regarding the shooting.
(Docket Entry # 62, p. 3).  Salach and Tully seek summary
judgment on Count Two.

     "Under Massachusetts law, either of two possible causes of
action may be called 'civil conspiracy.'" Aetna Cas. Sur. Co.
v. P & B Autobody, 43 F.3d 1546, 1564 (1st Cir. 1994).  One
cause of action is known as a "coercive type" of civil
conspiracy.  Id.; see Jurgens v. Abraham, 616 F. Supp. 1381,
1386 (D. Mass. 1985).  Also known as "true conspiracy," this
cause of action is "very limited" and "rare." Massachusetts
Laborers' Health & Welfare Fund v. Phillip Morris, Inc., 62 F.
Supp. 2d 236, 244 (D. Mass. 1999).  The plaintiff is required to
"allege and prove that by 'mere force of number acting in
unison' the defendants exercised "some peculiar power of
coercion of the plaintiff which any individual standing in a
like relation to the plaintiff would not have had." Id.
(quoting Fleming v. Dane, 22 N.E.2d 609, 611 (Mass. 1939)).  In
"true conspiracy" cases, "the wrong was in the particular
combination of the defendants rather than the tortuous nature of

the underlying conduct." Kurker v. Hill, 689 N.E.2d 833, 836 (Mass. App. Ct. 1998). Although the second amended complaint fails to designate the type of civil conspiracy cause of action, the facts therein allege that Tully and Salach "conspired to" perform certain misconduct against Castro, namely, unlawfully seizing him and shooting him. (Docket Entry # 29, pp. 17-18). As such, the second amended complaint raises the more common type of a civil conspiracy under Massachusetts law, which entails conspiring to do a wrongful act, known as the "concerted action" type. Aetna Casualty Surety Co. v. P & B Autobody, 43 F.3d at 1564.

The concerted action form of civil conspiracy alleged in the second amended complaint requires a plaintiff to "show an underlying tortious act in which two or more persons acted in concert and in furtherance of a common design or agreement." Bartle v. Berry, 953 N.E.2d 243, 253 (Mass. App. Ct. 2011); accord Orellana v. Deutsche Bank National Trust Co., 2013 WL 5348596, at *11 (D. Mass. Aug. 30, 2013) ("[t]he concerted action theory of civil conspiracy requires an underlying tort"); see Aetna Casualty Surety Co. v. P & B Autobody, 43 F.3d at 1565. This "form of civil conspiracy" imposes liability "on one individual for the tort of another." Kurker v. Hill, 689 N.E.2d at 836; see Grant v. John Hancock Mut. Life Ins. Co., 183 F. Supp. 2d 344, 363 (D. Mass. 2002) ("'defendant may be held

36

liable for actions done by others pursuant to a common design or with the defendant's substantial assistance or encouragement'"); Massachusetts Laborers' Health & Welfare Fund v. Philip Morris, Inc., 62 F. Supp. 2d at 244 (concerted form of civil conspiracy "is 'more akin to a theory of common law joint liability in tort'").

"[T]he word conspiracy is frequently used to denote vicarious liability in tort for 'concerted action.'"  Aetna Cas. Sur. Co. v. P & B Autobody, 43 F.3d at 1564; see W. Page Keeton, Prosser and Keeton on Torts 322 (5th ed. 1984).  Thus, "to establish a civil conspiracy, a plaintiff must demonstrate that 'a combination of persons [acted] pursuant to an agreement to injure the plaintiff.'"  Gutierrez v. Mass. Bay Transp. Auth., 772 N.E.2d 552, 568 (Mass. 2002) (emphasis added); see also Berdell v. Wong, 46 N.E.3d 115, 2016 WL 767610, at *3 (Mass. App. Ct. 2016) ("to establish a civil conspiracy, a plaintiff must show 'a common design or an agreement, although not necessarily express, between two or more persons to do a wrongful act and, second, proof of some tortious act in furtherance of the agreement'") (quoting Aetna Cas. Sur. Co. v. P & B Autobody, 43 F.3d at 1564).

In the case at bar, Salach argues there was no "meeting of the minds" to form the requisite concerted action regarding the shooting.  (Docket Entry # 62, p. 3).  Tully similarly maintains

there was "no concerted action" because he was the only
individual involved in discharging the firearm that wounded
Castro.  (Docket Entry # 60, p. 8).  Here, although both
officers had turned on their cruiser's blue lights to signal to
Castro to stop, neither Salach nor Tully coordinated with the
other regarding the events that immediately followed.  (Docket
Entry # 69-14, p. 1) (Docket Entry # 69-17, p. 26).  In fact,
there was no communication between Tully and Salach when
Castro's vehicle approached their position.

Accordingly, neither Salach nor Tully's actions satisfy the
"concerted action" requirement.  Likewise, neither Salach nor
Tully had a "common design or agreement" regarding their
reactions once Castro, thereafter, reversed his vehicle.  See
generally Aetna Cas. Sur. Co. v. P & B Autobody, 43 F.3d at
1564.  When Tully's and Castro's vehicles collided, Salach had
not coordinated or agreed with Tully about Tully's tactical
decisions.  (Docket Entry # 69-14, p. 2) (Docket Entry # 69-17,
p. 40).  Rather, Salach had independently positioned his cruiser
alongside Castro's vehicle to prevent Castro from escaping from
the traffic island.  (Docket Entry # 69-14, p. 2).

Although Tully drew his service weapon as he approached
Castro's vehicle on the traffic island, at no time did Tully
ever coordinate, agree, or in any way verbally or physically
signal to Salach that he was going to shoot Castro.  (Docket

Entry # 69-3, p. 72).  At the time, Salach was still in his
police cruiser.  Even though Tully fired his weapon, wounding
Castro, at no time throughout this chain of events was there
sufficient evidence for a reasonable jury to find an agreement
or plan between Tully and Salach.

Castro nevertheless argues that Tully and Salach met
outside the Lawrence police station after the shooting "to get
their stories straight." (Docket Entry # 71, p. 15).  It is
true that they had a meeting during which, at most, Salach asked
Tully if he had discharged is firearm. (Docket Entry # 69-17,
p. 46).  Such evidence is insufficient to allow a jury to infer
that Tully and Salach acted in concert to further a conspiracy
to "unlawfully seize Castro." (Docket Entry # 29, ¶ 169).  The
existence of the conversation fails to sufficiently evidence the
concerted action "to unlawfully seize Castro" or restrain his
"movement so Tully could shoot him." (Docket Entry # 29, p.
17).  Accordingly, Count Two is subject to summary judgment.

II.  Count Five:  Section 1983 Excessive Force and Unlawful
Seizure Against Tully and Salach

In Count Five, Castro alleges that Tully and Salach engaged
in an unlawful seizure and excessive force under section 1983
because Castro was Hispanic. (Docket Entry # 29, p. 20).
Specifically, the second amended complaint asserts that Tully
and Salach seized Castro "when they had their blue lights on

39

even though Castro had done nothing" and that Tully shot Castro
"without justification in violation of his Fourth and Fourteenth
Amendment protections because he was Hispanic." (Docket Entry #
29, pp. 20-21). The second amended complaint alleges that Tully
and Salach violated "Castro's Fourth and Fourteenth Amendment
right to be free from unreasonable seizure" as well as his
"Fourteenth Amendment right to due process of law by a near
deprivation of life without fair procedure." (Docket Entry #
29, p. 21).

Both Salach and Tully argue that Castro's "constitutional
rights were not violated by [the] initial stop." (Docket Entry
# 60, p. 7) (Docket Entry # 62, p. 5). They contend that the
"initial seizure" of Castro was permitted because "a police
officer may stop a motor vehicle to make a 'threshold inquiry
where suspicious conduct gives the officer reason to suspect
that a person . . . is about to commit a crime.'" (Docket Entry
# 60, p. 3) (citing Commonwealth v. Silva, 318 N.E.2d 895, 898
(Mass. 1974), and Terry v. Ohio, 392 U.S. 1, 19 (1968)). They
submit that they attempted to stop Castro for negligently
operating his vehicle. (Docket Entry # 62, p. 5) (Docket Entry
# 60, p. 4); see Mass. Gen. Laws ch. 90, § 24(2)(a). Tully and
Salach also assert that Castro's loud engine violated the City's
noise ordinance. (Docket Entry # 62, p. 5) (Docket Entry # 60,
p. 4) (Docket Entry # 82-1). Accordingly, they maintain they

conducted a lawful <u>Terry</u> stop after hearing Castro rev his engine and seeing it drive down Lawrence Street toward their position.  (Docket Entry # 60, p. 4) (Docket Entry # 62, pp. 4-5).  They also contend that their actions were justified in scope by the circumstances that rendered the initial stop permissible.  (Docket Entry ## 60, 62).

Regarding the excessive force claim against Tully, he asserts that his use of force, including crashing his cruiser into the Honda as well as drawing and discharging his firearm, was objectively reasonable under the Fourth Amendment.[6]  (Docket Entry # 60, p. 6).  Furthermore, Tully contends that, "even when a firearm goes off negligently, there must still be an analysis under the Fourth Amendment when the state actor creates the conditions that are highly likely to create harm."  (Docket Entry # 60, p. 6).  Tully argues that he was objectively reasonable in drawing his firearm because Castro "had just endangered the public by driving the wrong way at excessive speeds in reverse, [and] then crashed his car into Tully's cruiser."  (Docket Entry # 60, p. 6).  Finally, Salach maintains he is entitled to qualified immunity with respect to the unlawful seizure claim (Docket Entry # 62, pp. 8-10) and Tully

---

[6]  Salach does not address the excessive force claim in his memorandum.

asserts an entitlement to qualified immunity on the excessive
force claim (Docket Entry # 60, pp. 12-14).[7]

A.  Unlawful Seizure

     With respect to the unlawful seizure claim, the Fourth
Amendment provides that the "right of the people to be secure in
their persons, houses, papers, and effects, against unreasonable
searches and seizures, shall not be violated."  U.S. Const.
amend. IV.  This right proscribes law enforcement officers from
making intrusive encounters that fall short of a full scale
arrest.  United States v. Gilliard, 847 F.2d 21, 24 (1st Cir.
1988).  The Supreme Court in Terry, 392 U.S. at 30, established
the baseline rule allowing an officer to conduct a "brief
investigatory stop if he has a reasonable, articulable suspicion
that criminal activity is afoot."  United States v. Romain, 393
F.3d 63, 71 (1st Cir. 2004); accord United States v. Dapolito,
713 F.3d 141, 147 (1st Cir. 2013) ("police may stop and briefly
detain an individual for investigative purposes if the police
have a reasonable suspicion that criminal activity is afoot").
When a person is "seized" for a Terry stop and officers subject
him to a "search," the police conduct "must be tested by the

_____

[7]  Although the relevant caption in the section of Salach's brief
that addresses qualified immunity mentions excessive force, the
body of the argument only develops the argument relative to the
unlawful seizure claim.  (Docket Entry # 62, pp. 8-10).

Fourth Amendment's general proscription against unreasonable searches and seizures." Terry v. Ohio, 392 U.S. at 19-20.

Assessing the constitutionality of a Terry stop implicates a dual inquiry of "whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference." Id. at 20; accord United States v. Maguire, 359 F.3d 71, 76 (1st Cir. 2004) ("first determin[ing] whether the officers' actions were justified at their inception, and if so, whether the actions undertaken by the officers following the stop were reasonably responsive to the circumstances justifying the stop . . . augmented by information gleaned by the officers during the stop") (internal brackets, citations and quotation marks omitted); United States v. Chhien, 266 F.3d 1, 6 (1st Cir. 2001) (court considers "whether the officers' actions were justified at their inception, and if so, whether the officers' subsequent actions were fairly responsive to the emerging tableau"). The actions of the police must be "reasonable under the circumstances," United States v. McCarthy, 77 F.3d 522, 529 (1st Cir. 1996), and in making this determination the court employs "a wide lens and survey[s] the totality of the circumstances." Romain, 393 F.3d at 71.

The reasonable suspicion test amounts to an intermediate standard requiring "more than a naked hunch that a particular

person may be engaged in some illicit activity" but less than probable cause "or evidence of a direct connection linking the suspect to the suspected crime." Chhien, 266 F.3d at 6; accord United States v. Cook, 277 F.3d 82, 85 (1st Cir. 2002) (standard requires "more than unfounded speculation but less than probable cause"). Employing a contextual analysis and affording a degree of deference to the expertise of law enforcement officers, Cook, 277 F.3d at 85, "a stop is justified at its inception if the officer can 'point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant [the] intrusion.'" Romain, 393 F.3d at 71 (quoting Terry v. Ohio, 392 U.S. at 21).

The propriety of the initial stop also depends upon "what the officer knows (or has reason to believe) and how events unfold." Id. The touchstone is the reasonableness of the conduct in light of all the attendant circumstances. United States v. Osbourne, 326 F.3d 274, 277 (1st Cir. 2003). Reasonableness entails a balancing of "'the need to search (or to seize) against the invasion which the search (or seizure) entails.'" Terry v. Ohio, 392 U.S. at 21; accord Chhien, 266 F.3d at 6 ("court must balance 'the nature and quality of the intrusion on personal security against the importance of the governmental interests alleged to justify the intrusion'"); United States v. Young, 105 F.3d 1, 7 (1st Cir. 1999)

44

("[w]eighing 'the limited violation of the individual's privacy against the opposing interests in crime prevention and detection and in the police officer's safety'").  In addition, "actions such as unholstering a weapon and obstructing a vehicle's path do not, as a matter of law, transmogrify an otherwise lawful Terry stop into a de facto arrest." United States v. Lee, 317 F.3d 26, 31-32 (1st Cir. 2003).

A seizure occurs when the officer, by means of physical force or show of authority with submission, has in some way restrained the liberty of a citizen.  See Terry v. Ohio, 392 U.S. at 19; California v. Hodari D., 499 U.S. 621, 626 (1991) (seizure requires "either physical force . . . or, where that is absent, submission to the assertion of authority"); see also United States v. Mendenhall, 446 U.S. 544, 569 (1980) (show of authority must be such that a reasonable person would believe he was not free to leave).  The mere grasping or application of physical force is sufficient.  See Hodari D., 499 U.S. at 624. Absent physical force, however, a seizure requires that the citizen must actually submit to the show of authority.  See United States v. Holloway, 499 F.3d 114, 117 (1st Cir. 2007); United States v. Smith, 423 F.3d 25, 31 (1st Cir. 2005) ("[t]o constitute a seizure, there must not only be a show of authority sufficient to make a reasonable person believe that he was not free to leave, but also submission to that authority").  A

police officer may make a seizure by a "show of authority" and
"without the use of physical force," but there is no seizure
without actual submission; otherwise, there is at most an
attempted seizure, as far as the Fourth Amendment is concerned.
Brendlin v. California, 551 U.S. 249, 254 (2007); see United
States v. Bates, 750 F. Supp. 2d 342, 350 (D. Mass. 2010)
("[a]ttempted seizures of a person are generally beyond the
scope of the Fourth Amendment").

     For example, when a vehicle backs away from the show of
authority of a police cruiser's activation of blue lights, it is
not considered a submission to the show of authority.  United
States v. Salazar, 609 F.3d 1059, 1067 (10th Cir. 2010) (finding
no case that "suggests that, in these or similar circumstances,
backing away from a police car with flashing lights can be
plausibly viewed as submission to the command to stop").  In an
unpublished Seventh Circuit decision, the court did not find a
seizure in circumstances analogous to the case at bar.  United
States v. Bady, No. 12-3003, 2013 WL 501786, at *3 (7th Cir.
Feb. 12, 2013) (unpublished).[8]

     Though the officers' use of their emergency lights and
     their attempt to position their car to block in the
     [vehicle] unquestionably qualif[ied] as shows of authority,

---

[8]  In accordance with the Seventh Circuit Local Rule, this court
does not consider the Bady decision as precedent.  See 7th Cir.
LR. 32.1.  In any event, Salach and Tully do not raise an
argument that there was no submission.

see <u>Griffin</u>, 652 F.3d at 798[9] (citing <u>Brower v. Cnty. of</u>
<u>Inyo</u>, 489 U.S. 593, 597-98, 109 S.Ct. 1378, 103 L.Ed.2d 628
(1989)), Bady and the driver of the [vehicle] did not
initially submit to the officers.  Instead the driver
attempted to flee by backing up and attempting to drive
around the officers' truck.

<u>United States v. Bady</u>, 2013 WL 501786, at *2.

As previously noted, Tully and Salach argue that the
initial stop was justified under <u>Terry</u>.  They submit that they
stopped Castro because they suspected that he was negligently
operating a motor vehicle and/or violating the City's noise
ordinance.  (Docket Entry # 60, p. 4) (Docket Entry # 62, p. 5).

Examining the former basis for the initial attempted stop,
issues of fact exist regarding whether Castro was operating the
Honda recklessly or negligently such as to endanger lives as he
approached Tully and Salach's cruisers on Lawrence Street.
Castro testified that he was traveling the speed limit and Tully
and Salach otherwise describe the loud revving of the vehicle's
engine.  Such evidence allows a reasonable jury to find that
Tully and Salach lacked a reasonable suspicion of a violation of
reckless or negligent operation of a vehicle in violation of
chapter 90, section 24 as to this initial attempted stop.

Turning to the City's noise ordinance as a basis for the
initial attempted stop, the ordinance renders it "unlawful for
any person to make" or cause "noise which either annoys, injures

---

[9]   <u>United States v. Griffin</u>, 652 F.3d 793 (7th Cir. 2011).

or endangers the . . . health or safety of others during certain hours."  Lawrence Municipal Code, No. 9.04.040; (Docket Entry # 82-1).  The ordinance applies, inter alia, to vehicles.  Id.  In proscribing the conduct as "unlawful," the ordinance imposes a "penalty" of a $200 fine "for each offense."  Id.  Classification of the ordinance as a criminal offense, which undeniably constitutes "criminal activity" under Terry, 392 U.S. at 30, or as a civil infraction entails examining the intent of legislative body enacting the ordinance.[10]  See Smith v. Doe, 538 U.S. 84, 92 (2003) ("[w]hether a statutory scheme is civil or criminal 'is first of all a question of statutory construction'"); see also Carr v. D.C., Civil Action No. 06-0098-ESH, 2006 WL 6003758, at *2 (D.D.C. July 26, 2006) (examining whether parading without permit was civil infraction or criminal offense).  Here, the penalty imposed of a fine as opposed to an arrest or incarceration, see Lawrence Municipal Code, Nos. 9.04.011; see generally Howes v. Hitchcock, 66 F. Supp. 2d 203, 214 (D. Mass. 1999), coupled with the civil enforcement procedure under section 21D evidences the Lawrence

---

[10]  The Lawrence City Council is the applicable legislative body. The ordinance allows enforcement "by police officers" as well as "by noncriminal procedure" under Massachusetts General Laws chapter 40, section 21D ("section 21D").  Lawrence Municipal Code, No. 9.04.040; (Docket Entry # 82-1).

City Council's intent that the noise ordinance constitute a civil infraction rather than a criminal offense.

Having determined that the offense at issue is a civil infraction, the issue reduces to whether <u>Terry</u>, which allows a brief investigatory stop if the officer has a reasonable, articulable suspicion "that criminal activity is afoot," <u>Terry v. Ohio</u>, 392 U.S. at 30, extends to a vehicle stop based on a suspected violation of a civil noise infraction. Putting aside whether the reasonable suspicion or the more onerous probable cause standard applies, courts uniformly uphold traffic stops of vehicles for civil traffic or noise infractions. <u>See</u> <u>United States v. Ross</u>, No. 06-4106, 2008 WL 4888993, at *3 (6th Cir. Nov. 12, 2008) (affirming lower court's ruling finding a vehicle stop lawful based on "violation of the municipal noise ordinance") (unpublished);[11] <u>United States v. Deleston</u>, No. 01-4129, 2001 WL 1523354 (4th Cir. Nov. 30, 2001) (affirming determination that officers had probable cause to make the traffic stop for "violating a local noise ordinance") (unpublished);[12] <u>United States v. Arias</u>, 09-CR-6126-CJS, 2010 WL

---

[11]  As an unpublished decision in the Sixth Circuit, the decision is not considered precedent by this court.  <u>See</u> <u>U.S. ex rel. Bledsoe v. Community Health Sys., Inc.</u>, 501 F.3d 493, 507 (6th Cir. 2007) (noting that unpublished decisions are not considered controlling precedent under 6th Cir. LR. 28).

[12]  The Fourth Circuit "'ordinarily does not accord precedential value to its unpublished decisions' although those decisions are entitled 'to the weight they generate by the persuasiveness of

2593933, at *7 (W.D.N.Y. June 17, 2010) (finding vehicle stop lawful based on officer's observations which created "*both* probable cause to believe that the driver of the Tahoe had violated the noise ordinance and" operating vehicle without license plate) (emphasis added); United States v. Fuentez, No. EDCR 08-174-VAP, 2009 WL 362120, at *3 (C.D. Cal. Feb. 11, 2009) ("officers had reasonable suspicion to stop Defendant because of the loud music they heard coming from his car, in violation of the California Vehicle Code"); United States v. Simpson, 1:08-CR-00414, 2009 WL 614906, at *2 (N.D. Ohio Jan. 22, 2009) ("officers possessed probable cause to believe that Defendant had violated the municipal noise ordinance" thus allowing them "to conduct a traffic stop of Defendant's vehicle"); United States v. Davis, 2:07-CR-0248-WKW, 2008 WL 1927377, at *2 (M.D. Ala. Apr. 28, 2008) ("[t]he uncontested grounds for the stop was violation of the city's noise ordinance"); United States v. Cullars, CR 106-100, 2007 WL 41953, at *3 (S.D. Ga. Jan. 3, 2007) ("probable cause existed for the traffic stop" based on noise violation under state law); United States v. Patt, Crim. No. 05-60047, 2006 WL 3240760, at *4 (W.D. La. Oct. 6, 2006) (officer "had legitimate grounds to pull Patt over for a

_____

their reasoning.'"  DeMasters v. Carilion Clinic, 796 F.3d 409, 419 n.4 (4th Cir. 2015); 4th Cir. Loc. R. 32.1.  Accordingly, this court affords no precedential weight to the Deleston decision.

violation of the local noise ordinance"); <u>United States v.</u>
<u>Borne</u>, 4:05-CR-23, 2005 WL 2290273, at *1 (E.D. Tenn. Sept. 20,
2005) (police officer "had probable cause to make a traffic
stop" based on "muffler making excessive noise in violation of
Tenn.Code Ann. § 55-9-202"); <u>McPherson v. Auger</u>, 842 F. Supp.
25, 29-30 (D. Me. 1994) (officer "had a reasonable articulable
suspicion that Plaintiff's squealing of her vehicle's tires was
a violation of a state traffic regulation prohibiting
unnecessary noise and that he acted lawfully in stopping
Plaintiff's vehicle").

Whereas a number of these cases apply a probable cause
standard and others apply a reasonable suspicion standard,
routine traffic stops outside the realm of a civil, non-traffic
municipal ordinance adhere to a reasonable suspicion analysis.
Simply stated, a routine traffic stop:

> is not normally considered an "arrest" which must be
> supported by probable cause.  Rather, it "is more analogous
> to a so-called 'Terry stop,'" <u>Knowles v. Iowa</u>, 525 U.S.
> 113, 117, 119 S.Ct. 484, 142 L.Ed.2d 492 (1998) (quoting
> <u>Berkemer v. McCarty</u>, 468 U.S. 420, 439, 104 S.Ct. 3138, 82
> L.Ed.2d 317 (1984)), for which "reasonable suspicion" of a
> traffic violation is the only initial requirement.  <u>See</u>
> <u>Kenney v. Floyd</u>, 700 F.3d 604, 608 (1st Cir. 2012); <u>see</u>
> <u>also</u> <u>United States v. Chaney</u>, 647 F.3d 401, 408 (1st Cir.
> 2011) ("The contours of the showing necessary to satisfy
> the Fourth Amendment depend on the nature of the detention:
> arrests, whether formal or de facto, require that the
> detaining officer have grounds for probable cause, whereas
> temporary detentions (including investigatory or <u>Terry</u>
> stops . . .) 'may be grounded on a lesser showing
> equivalent to reasonable suspicion.'" (quoting <u>Terry v.</u>

_Ohio_, 392 U.S. 1, 21, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968))).

_Damon v. Hukowicz_, 964 F. Supp. 2d 120, 144 (D. Mass. 2013); _see also United States v. Fox_, 393 F.3d 52, 59 (1st Cir. 2004), _cert. granted and judgment vacated on other grounds_, 545 U.S. 1125 (2005).  As indicated by the Supreme Court, to justify a traffic stop, "officers need only 'reasonable suspicion'—that is, 'a particularized and objective basis for suspecting the particular person stopped' of _breaking the law_." _Heien v. North Carolina_, 135 S.Ct. 530, 536 (2014) (stating that "[a]ll parties agree" to this principle) (emphasis added); _accord U.S. v. Gaffney_, 789 F.3d 866, 868 (8th Cir. 2015) ("[t]o justify a traffic stop, officers need only 'reasonable suspicion'") (quoting _Heien_, 135 S.Ct. at 536, with internal brackets omitted).  The majority of circuit courts endorse the reasonable suspicion standard in measuring the validity of a traffic stop grounded on a traffic law.  _See United States v. Delfin-Colina_, 464 F.3d 392, 396 (3d Cir. 2006) (noting that "the Second, Sixth, Eighth, Ninth, Tenth and Eleventh Circuits" hold that police officers only need "reasonable suspicion to believe that a traffic law has been broken" before initiating a traffic stop); 4 Wayne R. LaFave, _Search and Seizure_ § 9.3(a) n.19 (2017) (collecting circuit court cases applying reasonable suspicion standard to "traffic stops as a class").

The facts in the case at bar satisfy both the probable
cause and the reasonable suspicion standard as a matter of law
based on the civil noise ordinance.[13]  In particular, Tully and
Salach initially turned onto Lawrence Street because they had
heard the loud revving of a car engine.  (Docket Entry # 69-3,
p. 49) (Docket Entry # 69-14, p. 1) (Docket Entry # 69-17, p.
26).  Salach testified that, when he turned onto Lawrence
Street, he the saw the Honda "revving its engine."  (Docket
Entry # 69-17, p. 26).  Tully testified that he and Salach heard
Castro's car "coming at [them] at a high rev."  (Docket Entry #
69-3, p. 49).  Tully and Salach reasonably activated their blue
lights to stop the Honda in order to investigate the objectively
reasonable suspicion of a violation of the City's noise
ordinance in the residential area.[14]  Likewise, their
observations and the sounds they heard constituted reasonably
trustworthy information to warrant a belief that Castro was
violating the City's noise ordinance.  See generally Beck v.
Ohio, 379 U.S. 89, 91 (1964) (probable cause requires officer to

---

[13]  It is therefore unnecessary to determine the applicable
standard.
[14]  Salach testified he attempted to stop the Honda to decide
whether to issue "a noise complaint."  (Docket Entry # 69-17, p.
27).  He agreed, however, that there would be no "reason to
block the line of traffic for a noise violation."  (Docket Entry
# 69-5, p. 161).  Salach's personal or subjective belief is not
germane to the constitutionality and objective reasonableness
inquiry under the Fourth Amendment of the initial stop.  See
Whren v. United States, 517 U.S. 806, 813 (1996).

have "reasonably trustworthy information sufficient to warrant a
prudent man in believing" individual is guilty of a crime).
Their momentary, brief attempt to stop Castro before he reversed
the Honda and traveled backwards at a high rate of speed was
reasonable as a matter of law.

Immediately thereafter, Castro's conduct escalated into a
potential criminal offense, namely, a reckless or negligent
operation of the Honda.  Under chapter 90, section 24:

> Whoever upon any way or in any place to which the public
> has a right of access, or any place to which members of the
> public have access as invitees or licensees, operates a
> motor vehicle recklessly, or operates such a vehicle
> negligently so that the lives or safety of the public might
> be endangered . . . shall be punished by a fine of not less
> than twenty dollars nor more than two hundred dollars or by
> imprisonment for not less than two weeks nor more than two
> years, or both . . . ..

Mass. Gen. Laws ch. 90, § 24(2)(a).  "[I]t is not the duration
of negligent operation or the proximity of the public but 'the
operation of the vehicle itself that is the crime.'"
Commonwealth v. Ferreira, 872 N.E.2d 808, 810 (Mass. App. Ct.
2007) (quoting Commonwealth v. Constantino, 822 N.E.2d 1185,
1190 (Mass. 2005)).  "The statute only requires proof that the
defendant's conduct might have endangered the safety of the
public, not that it in fact did."  Commonwealth v. Duffy, 818
N.E.2d 176, 179 (Mass. App. Ct. 2004); see Commonwealth v.
Constantino, 822 N.E.2d at 1185 ("a person may operate a vehicle
in such a way that would endanger the public although no other

54

person is on the street").  Finally, "[i]t is quite possible for
public safety to be put in jeopardy by conduct that occurs over
the span of an instant."  Commonwealth v. Constantino, 822
N.E.2d at 1185.

In lieu of submitting to the officers' show of authority of
activating their lights and blocking the lanes preventing Castro
from proceeding forward on Lawrence Street, Castro traveled in
reverse at a high rate of speed moving from one lane into the
other.  At this point, the officers had both probable cause for
a violation of chapter 90 and a reasonable suspicion of criminal
activity based on chapter 90.  See United States v. Bates, 750
F. Supp. 2d at 350 (noting that "[a]ttempted seizures" are
beyond scope of Fourth Amendment and, initial interaction during
which officers walked toward defendant with guns drawn "does not
have any constitutional significance on its own" because
defendant did not submit); United States v. Vargas, 86 F. Supp.
3d at 41, n.11.[15]

In response to Castro reversing the Honda, Tully attempted
again to stop Castro.  When Tully engaged in an arguably
reasonable attempt to pass the Honda and warn any potentially

---

[15]  Although the initial attempted stop lacks constitutional
significance on its own, it is still considered part of the
totality of the circumstances.

oncoming traffic of the danger, the vehicles collided.[16]   Tully's cruiser thereafter pushed the Honda back onto the southbound lane and then onto the traffic island to safeguard potentially oncoming motorists turning onto Lawrence Street or pedestrians. A reasonable jury could likewise conclude that Tully's conduct of ramming the Honda and forcing it off the street violated LPD's policy prohibiting ramming a suspect vehicle and passing or overtaking a suspect vehicle.  (Docket Entry # 69-7, p. 32); see generally Raiche v. Pietroski, 623 F.3d 30, 37 (1st Cir. 2010) (considering Boston Police Department's standards in reviewing qualified immunity's first prong for excessive force claim).  Although it is a close question inasmuch as the purpose of the attempted stop was to control Castro's negligent operation of the Honda, a reasonable jury could find Tully's conduct after the initial attempted stop unreasonable particularly in light of the materially disputed LPD policy violations.  A reasonable jury could also find Tully's conduct of drawing his weapon as he exited his cruiser and thereafter using deadly force unreasonable thereby also warranting a denial of summary judgment on the unlawful seizure claim.

---

[16]  A reasonable jury could find that Tully's conduct constituted an unauthorized pursuit under LPD policies.  (Docket Entry # 69-7, pp. 26, 28).

Salach's conduct, however, was reasonable under the
circumstances and fairly responsive to the emerging tableau of
Castro's erratic behavior and driving.  As the events continued,
Castro's operation of the Honda became more negligent and unsafe
to both Tully and Salach, as well as to potential and reasonably
likely vehicles or pedestrians that might have come into the
Honda's path.  There is also little, if any, indication that
Salach violated LPD policies.[17]  In fact, he reasonably
positioned his cruiser "nose to nose" with the Honda to block
the vehicle from escaping in accordance with LDP policy.
(Docket Entry # 69-3, p. 33) (Docket Entry # 69-17, p. 42).  In
the context of Castro's previous erratic and dangerous driving,
witnessing the Honda going in reverse, and then seeing Tully
immediately behind the vehicle, Salach's conduct in pursuing the
Honda was reasonable and responsive to the circumstances
justifying the attempted stop as a matter of law.  In sum,
summary judgment in Salach's favor, albeit not in Tully's favor,
is appropriate with respect to the merits of the unlawful
seizure claim.

---

[17]  Castro only argues that Tully violated various LPD policies
(Docket Entry # 71, pp. 8-13) thereby waiving the issue of any
policy violations by Salach, albeit only for purposes of
resolving Salach's summary judgment motion.  See Coons v.
Industrial Knife Co., Inc., 620 F.3d 38, 44 (1st Cir. 2010).

Salach also seeks qualified immunity as an alternative basis to allow summary judgment on the unlawful seizure claim. Tully limits his qualified immunity argument to the excessive force claim.

"'Qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" MacDonald v. Town of Eastham, 745 F.3d 8, 11 (1st Cir. 2014) (quoting Pearson v. Callahan, 555 U.S. 223, 231 (2009)) (internal brackets omitted).  The doctrine affords "'breathing room'" to government officials "'to make reasonable but mistaken judgments about open legal questions.'"  Id. (quoting Ashcroft v. al-Kidd, 563 U.S. 741, 743 (2011)).  The doctrine does not protect public officials "who, 'from an objective standpoint, should have known that their conduct was unlawful.'"  Drumgold v. Callahan, 707 F.3d 28, 42 (1st Cir. 2013) (quoting Haley v. City of Boston, 657 F.3d 39, 47 (1st Cir. 2011)).

Adhering to a twofold analysis, the court examines "'(1) whether the facts alleged or shown by the plaintiff make out a violation of a constitutional right; and (2) if so, whether the right was "clearly established" at the time of the defendant's alleged violation.'"  Rocket Learning, Inc. v. Rivera-Sanchez, 715 F.3d 1, 8 (1st Cir. 2013) (quoting Maldonado v. Fontanes,

568 F.3d 263, 269 (1st Cir. 2009)).  These two steps "need not
be considered in any particular order, and both prongs must be
satisfied for a plaintiff to overcome a qualified immunity
defense."  Raiche v. Pietroski, 623 F.3d at 35; accord Rocket
Learning, Inc. v. Rivera-Sanchez, 715 F.3d at 9 ("federal courts
have discretion to administer" the "test in the order that they
determine "'will best facilitate the fair and efficient
disposition of each case'").

The first prong establishes immunity in Salach's favor.
For reasons explained above, Salach did not unlawfully seize
Castro in violation of the Fourth Amendment.

The second prong entails ascertaining "(a) the clarity of
the law in general at the time of the alleged violation; and (b)
the clarity of the law as applied to the case-in other words,
whether a reasonable person in the defendant's shoes 'would have
understood that his conduct violated the Plaintiff's
constitutional rights.'"  Raiche v. Pietroski, 623 F.3d at 36;
accord McKenney v. Mangino, 873 F.3d 75, 81 (1st Cir. 2017)
("second step is itself divisible into two components").  The
latter aspect is "'undertaken in light of the specific context
of the case, not as a broad general proposition.'"  Rocket
Learning, Inc. v. Rivera-Sanchez, 715 F.3d at 9 (quoting
Brosseau v. Haugen, 543 U.S. 194, 198 (2004)); see also Estrada
v. Rhode Island, 594 F.3d 56, 63 (1st Cir. 2010) (inquiry is

"'highly fact specific'").  The dispositive inquiry "'is whether it would be clear to a reasonable official that his conduct was unlawful in the situation he confronted.'"  Rocket Learning, Inc. v. Rivera-Sanchez, 715 F.3d at 9 (quoting Maldonado v. Fontanes, 568 F.3d at 269); see Gericke v. Begin, 753 F.3d 1, 6 (1st Cir. 2014) (task determines whether "'law at the time of the alleged violation gave the defendant fair warning that his particular conduct was unconstitutional'").  Although an existing case "'"directly on point"'" is not required "for a right to be clearly established, '"existing precedent must have placed the statutory or constitutional question beyond debate."'"  White v. Pauly, 137 S.Ct. 548, 551 (2017); accord Hill v. Walsh, No. 17-1669, __F.3d__, 2018 WL 1060466, at *4 (1st Cir. Feb. 27, 2018) ("existing precedent at the time of the officers' conduct 'must be clear enough that every reasonable official would interpret it' to bar the conduct at issue") (emphasis in original).

    "[T]he Fourth Amendment right to be free from investigatory stops in the absence of reasonable suspicion was clearly established" at the time of the June 2013 incident.  Eldredge v. Town of Falmouth, MA, 662 F.3d 100, 106 (1st Cir. 2011) (citing Terry v. Ohio, 392 U.S. at 30, in determining clearly established law for unlawful seizure claim).  At a general level, the relevant qualified immunity inquiry is whether "'the

presence of reasonable suspicion is at least arguable." Id.
(internal brackets omitted). Id. at 107. "[R]easonable
suspicion requires 'sufficient probability, not certainty.'"
Id. (quoting New Jersey v. T.L.O., 469 U.S. 325, 346 (1985)).

As to the initial attempted stop, no clearly established
law afforded fair warning prohibiting the stop of a vehicle
based on a reasonable, articulated suspicion of a violation of a
civil municipal noise ordinance.  No reasonable officer would
have understood that he could not investigate a noise violation
by stopping or attempting the stop the vehicle emanating the
noise.  In fact, caselaw in effect prior to June 2013 indicated
that the Fourth Amendment *allowed* police to stop a vehicle for
an observed traffic law violation based on a reasonable
suspicion.  See Kenney v. Floyd, 700 F.3d 604, 608 (1st Cir.
2012); McPherson v. Auger, 842 F. Supp. at 29-30.  Moreover, the
Honda's revving of the engine in a residential area early in the
morning provided more than sufficient reasonable articulable
suspicion of a noise violation under the ordinance.  (Docket
Entry # 82-1).

Furthermore, after the initial attempted stop it is at
least arguable that Salach had articulable facts giving rise to
a reasonable suspicion that the Honda's operation might have
endangered the public's safety in violation of chapter 90.
Mass. Gen. Laws ch. 90, § 24(2)(a); see Commonwealth v. Duffy,

818 N.E.2d at 179.   Salach himself saw the infraction of Castro weaving out of the lane and traveling in reverse at a high rate of speed, as stated in Salach's incident report.   (Docket Entry # 69-15) (Docket Entry # 69-17, p. 34) (Docket Entry # 69-5, p. 149).   Such direct, first-hand observation created the reasonable articulable suspicions based on the facts that Castro's operation of the Honda was reckless or negligent such that lives or the safety of the public might be endangered.   In fact, Salach's "observation[s] did not have to be correct to constitute reasonable suspicion" because clearly established law required only "a 'reasonable and articulable suspicion of criminal activity.'"   United States v. Brown, 621 F.3d 48, 56 (1st Cir. 2010).   Adding to the mix qualified immunity's allowance for mistakes in judgment and the degree of deference afforded to the expertise of law enforcement officers, Salach's conduct falls squarely within the parameters of clearly established law.   Put another way, Salach's assessment of the Honda's operation as negligent or reckless in the context of revving its engine in a loud manner on a residential street, refusing to stop in response to the shows of authority, and then traveling in reverse at a high rate of speed in and out of the lane was not "so obviously misguided that no reasonable officer could have reached the same conclusion."   Eldridge v. Town of Falmouth, MA, 662 F.3d at 107.

Clearly established law next requires that the officer's conduct be reasonably related in scope to the circumstances justifying the stop for the negligent or reckless operation. Salach's conduct of not preventing Tully's split-second action of passing Salach's cruiser and then colliding and pushing the Honda onto the traffic island did not violate any clearly established law.  Indeed, the Honda's operation reasonably posed a threat to the safety of potential motorists and pedestrians. Salach's conduct of trying to block Castro on the traffic island was also responsive to the safety threat the Honda posed to the public.  Even if Salach was mistaken in blocking the Honda on the traffic island or pursuing the Honda after it almost ran over Tully, his actions were not obviously misguided when measured against clearly established law.  Making allowances for mistakes in judgment, if *any*, Salach's conduct did not violate clearly established unlawful seizure law in effect at the time of the June 2013 incident.

B.  Excessive Force

"Excessive force claims are founded on the Fourth Amendment right to be free from unreasonable seizures of the person." Raiche v. Pietroski, 623 F.3d at 36.  These claims require the plaintiff to "'show that the defendant officer employed force that was unreasonable under the circumstances.'"  Kenney v. Floyd, 700 F.3d at 609 (quoting Jennings v. Jones, 499 F.3d 2,

11 (1st Cir. 2007)).  Objective reasonableness is "the constitutional touchstone."  Raiche v. Pietroski, 623 F.3d at 36.  Viewed "'from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight,'" Kenney v. Floyd, 700 F.3d at 609, the assessment requires "weighing three non-exclusive factors:  (1) 'the severity of the crime at issue,' (2) 'whether [the suspect] poses an immediate threat to the safety of the officers or others,' and (3) 'whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight.'"  Raiche v. Pietroski, 623 F.3d at 36 (quoting Graham v. Connor, 490 U.S. 386, 396 (1989)); Morelli v. Webster, 552 F.3d at 23.  "Fourth Amendment jurisprudence has long recognized that the right to make an . . . investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it."  Graham v Connor, 490 U.S. at 396.  "Only excessive force is actionable; 'not every push or shove rises to the level of a constitutional violation.'"  Goddard v. Kelley, 629 F. Supp. 2d 115, 124 (D. Mass. 2009) (quoting Gaudreault v. Municipality of Salem, Mass., 923 F.2d 203, 205 (1st Cir. 1990)).

Tully argues that the claim fails because his conduct was objectionably reasonable.  He also points out that Castro's driving in reverse at excessive speeds endangered the public before Tully drew his firearm.  (Docket Entry # 60).

64

With respect to the first factor, "the severity of the crime at issue," <u>Raiche v. Pietroski</u>, 623 F.3d at 36, Castro was operating his vehicle in a negligent manner that could have endangered the public.  <u>See</u> Mass. Gen. Laws ch. 90, § 24(2)(a). On the other hand, LPD policy characterized reckless operation of a vehicle as not warranting a pursuit.  (Docket Entry # 69-7, p. 26); <u>see</u> <u>Raiche v. Pietroski</u>, 623 F.3d at 37.

As to the other factors, Castro failed to submit to Tully and Salach in response to the activation of the cruisers' overhead lights and the positioning of their cruisers on Lawrence Street.  Once Castro reversed the Honda at a high rate of speed, Tully "attempted to pass Castro to warn any oncoming traffic that he was coming at them in reverse." (Docket Entry # 69-3, p. 57.  Viewing the record in Castro's favor, Tully's vehicle crashed into Castro's vehicle first.  Tully also later admitted "that he rammed the Honda" (Docket Entry # 69-16, p. 6), which amounts to a violation of LPD policy (Docket Entry # 69-7, p. 32).  <u>See</u> <u>Raiche v. Pietroski</u>, 623 F.3d at 37.  Tully further testified that, once he made contact with Castro's vehicle, he "turned [his] steering wheel into" the Honda and pushed it "back to the southbound lane out of the northbound lane" on Lawrence Street.  (Docket Entry # 69-3, p. 69) (Docket Entry # 69-16, p. 6).

Whereas a reasonable jury could find that Tully's actions of ramming the Honda and pushing the vehicle onto the traffic island contravened LPD policy, it could also find that Castro's driving posed an immediate threat to other, reasonably likely civilian motorists as he reversed down Lawrence Street at a high rate of speed.  See generally Kenney v. Floyd, 700 F.3d at 609 (citing Graham v. Connor, 490 U.S. at 396-397).  That said, the fact that it was early on a Saturday morning lessened the likelihood of oncoming traffic.  Once on the traffic island, Tully drew his weapon and put his trigger finger alongside the trigger guard in the context of Castro "revving his engine, spinning his tires, [and] trying to break free from being locked together with [Tully's] cruiser." (Docket Entry # 69-17, p. 42).  When Tully was behind the Honda, a reasonable jury could easily find he was in a life-threatening situation and that a reasonable police officer would view the reversing Honda and its erratic driver as an immediate threat to his safety. (Docket Entry # 69-3, p. 78).  Tully's position placed him behind the Honda as it went in reverse in the context of a driver who had been revving the engine, spinning the tires, and showing no signs of stopping.  At no point did Castro attempt to exit his vehicle, speak to Tully, or stop trying to escape.  Thus, a reasonable jury could readily find that Tully's action of discharging his firearm was reasonable because, from the

66

perspective of a reasonable police officer in Tully's position, Castro appeared to be attempting to use lethal force against Tully.[18]

Turning to the third factor, Castro was "actively resisting arrest or attempting to evade arrest by flight." Raiche v. Pietroski, 623 F.3d at 36.  As detailed above, at no point did Castro stop for either Tully or Salach.  (Docket Entry # 69-14, p. 2).  Castro never attempted to speak with either Tully or Salach.  (Docket Entry # 69-14, p. 2).  On the Bennington Street

---

[18]  The above finding relative to Tully discharging his firearm assumes that the shooting was intentional because the Fourth Amendment is only implicated if the "governmental termination of freedom of movement [was] through means intentionally applied." Brower v. Cty. of Inyo, 489 U.S. 593, 597 (1989); see Stamps v. Town of Framingham, 813 F.3d 27, 35, 37 (1st Cir. 2016) ("[w]here an officer creates conditions that are highly likely to cause harm and unnecessarily so, and the risk so created actually, but accidentally, causes harm, the case is not removed from Fourth Amendment scrutiny") (emphasis added).  Here, it is debatable whether the Fourth Amendment applies to Tully's discharge of his firearm inasmuch as the record allows a jury to find that Castro created the immediate danger to Tully by reversing the Honda with Tully in the immediate vicinity of the vehicle's path at the time he slipped and fell.  See Stamps, 813 F.3d at 35, 37 (quoting Sixth Circuit case in parenthetical where it was undisputed that officer discharged "'weapon as he slipped and fell'" and "'the question [was] whether he acted reasonably in drawing his gun'").  There is nevertheless some evidence to support an inference that Tully discharged his firearm intentionally.  In particular, as set out in the facts, Salach and Fitzgerald testified that they would know if they had discharged their weapons and Salach testified that he had never discharged his weapon accidentally.  Coupled with certain discrepancies in Tully's deposition, this court finds a genuine issue of material fact exists as to whether Tully discharged his firearm intentionally.

traffic island, Castro was able to free his vehicle from its position, drive off the traffic island, and proceed north to Methuen.  (Docket Entry # 69-14, p. 2).  Castro's actions demonstrate he was attempting to evade Tully and Salach in their capacities as Lawrence police officers.

Examining the totality of the circumstances, whether the force employed by Tully was objectively reasonable as a matter of law is a close question.  On balance, in light of the ramming of the vehicle, the violation of the certain LPD policies, and other circumstances, a reasonable jury could find in Castro's favor on the excessive force claim against Tully.[19]

Tully is nevertheless entitled to qualified immunity on the excessive force claim.  Clearly established Fourth Amendment law requires objective reasonableness in the use of force.  See Raiche v. Pietroski, 623 F.3d at 36.  The three, non-exclusive Graham factors also constitute relevant clearly established law, but do not, by themselves, create the necessary specificity as

---

[19]  As a separate matter, Count Five remains in this action with respect to the purported constitutional violation against Castro "because he was Hispanic."  (Docket Entry # 29, p. 21).  In Count Five, Castro alleges an equal protection constitutional violation because he was treated differently, stopped, and shot without justification "because he was Hispanic."  (Docket Entry # 29, p. 21).  Neither Tully nor Salach's memoranda in support of their motions for summary judgment address the equal protection claim in Count Five regarding Castro's race.  (Docket Entry # 60, p. 3) (Docket Entry # 62, p. 4).

to clearly established law.  See White v. Pauly, 137 S.Ct. at

552.  "Such specificity is especially important in the Fourth

Amendment context, where the Court has recognized that '[i]t is

sometimes difficult for an officer to determine how the relevant

legal doctrine, here excessive force, will apply to the factual

situation the officer confronts.'"  Mullenix v. Luna, 136 S.Ct.

305, 308 (2015).  Mindful "that 'clearly established law' should

not be defined 'at a high level of generality,'" White v. Pauly,

137 S.Ct. at 552, there was no caselaw existing prior to the

June 2013 incident that would give Tully fair warning that it

was unlawful to either draw and point his firearm at the vehicle

or to discharge his firearm at the reversing vehicle.  Rather,

the contours of clearly established excessive force law at the

time instructed that detaining an *unresisting* individual

suspected of a petty theft and pinning the individual with

sufficient force to cause a relatively serious injury was

unconstitutional.  See Morelli v. Webster, 552 F.3d at 24-25.

Similarly, a submissive individual on a parked motorcycle who

was not displaying any weapon or making verbal threats would not

warrant an officer tackling the individual to the ground

resulting in the individual dislocating his shoulder in the

context of relatively minor infractions.  See Raiche v.

Pietroski, 623 F.3d at 36-37 (further classifying driving

motorcycle without helmet and not stopping when signaled by
police as relatively minor crimes under Graham's first factor).

Here, Castro was neither submissive nor acting in an
unresisting manner.  Although the infractions were relatively
minor, Castro was actively evading the police, oftentimes
revving the engine, spinning his tires, and trying to exit the
area throughout the encounter.  At no time did Castro indicate
he would cease the erratic and unpredictable behavior.  Caselaw
did not clearly establish that conduct similar to ramming a
vehicle that was traveling at a high rate of speed in reverse in
an oncoming lane of traffic without any indication of stopping,
even if in violation of police standards, and pushing it off the
road to avoid the threat posed to the public constituted the use
of excessive force.  Moreover, as the events continued, Castro's
operation of the Honda became more negligent and unsafe to
potential motorists or pedestrians that might have come into the
Honda's path.  When Castro reversed the Honda with Tully behind
it, a reasonable police officer could easily view the
circumstances as an immediate threat to his safety.  Tully's
conduct was also not an obvious use of excessive force.  Making
allowances for mistakes in judgment, Tully is entitled to
qualified immunity for the excessive force claim.

III.  Count Six:  Section 1985 Conspiracy Claim Against Tully
and Salach

In Count Six, the second amended complaint asserts that
Tully and Salach conspired against Castro in violation of
section 1985.  (Docket Entry # 29, p. 22).  More specifically,
"Tully conspired with other LPD police officers to prevent
Salach from performing his duty to prevent the unjustified
shooting of Castro," according to the second amended complaint.
(Docket Entry # 29, p. 22).  Castro also asserts that, "Tully
conspired with Salach to impede, hinder, obstruct, and defeat
the due course of justice by acting in concert and conspiring to
deny Castro the equal protection of the laws" or the "equal
privileges and immunities under the law."  (Docket Entry # 29,
p. 22).

Although Count Six does not identify the applicable
subsection of 1985, the facts are not germane to either section
1985(1) or 1985(2).  "Section 1985(1) deals with conspiracies to
prevent persons from holding office or performing duties of a
public office."  Diaz v. Perez, Civil Action No. 16-11860-RGS,
2016 WL 6871233, at *7 (D. Mass. Nov. 21, 2016).  It applies to
federal officers of the United States as opposed to the state
police officers in the case at bar.  Donahue v. City of Boston,
304 F.3d 110, 122 n.9 (1st Cir. 2002) (section 1985(1) "protects
federal officers from those conspiring to prevent (by force,
intimidation, or threat) the officer from discharging his or her
duties").  "Section 1985(2) deals with obstructing justice to

deter any party or witness from attending or testifying in a court proceeding." Riley v. O'Brien, Civil Action No. 16-11064-LTS, 2016 WL 8679258, at *5 (D. Mass. Sept. 2, 2016).

Section 1985(3) involves "conspiracies intended to deprive an individual or class of persons of protected rights based on 'some racial, or perhaps otherwise class-based, invidiously discriminatory animus.'" Diaz v. Perez, 2016 WL 6871233, at *7 (quoting Alcyon v. Blanchard, 83 F.3d 1, 3 (1st Cir. 1996)). It creates a private right of action for "'injuries occasioned when "two or more persons . . . conspire . . . for the purposes of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws."'" Diva's Inc. v. City of Bangor, 411 F.3d 30, 38 (1st Cir. 2005) (quoting Burns v. State Police Association of Massachusetts, 230 F.3d 8, 12 n.3 (1st Cir. 2000)).

In seeking summary judgment on the section 1985(3) conspiracy claim, Tully and Salach argue that, because "there was no unconstitutional injury to inflict on [Castro]," as discussed with respect to the section 1983 claim, "there can be no conspiracy to violate [Castro's] civil rights." (Docket Entry # 60, p. 10) (Docket Entry # 62, p. 6). In making this argument, they rely exclusively on cases setting out a section 1983 conspiracy claim. See Estate of Bennett v. Wainwright, 548

72

F.3d 155, 178 (1st Cir. 2008); Earle v. Benoit, 850 F.2d 836,

844 (1st Cir. 1988); Lumpkin v. Lucey, Civil Action No. 09-

11921-RGS, 2010 WL 1794400, at *5 (D. Mass. May 4, 2010)

(elements of section 1983 conspiracy claim entail "(1) an

agreement between two or more state actors, or 'a state actor

and a private party; (2) to act in concert to inflict an

unconstitutional injury; and (3) an overt act done in

furtherance of that goal causing damages'") (quoting Ciambriello

v. County of Nassau, 292 F.3d 307, 324-25 (2d Cir. 2002), which

sets out elements of "a § 1983 conspiracy claim").[20]  After

setting out the foregoing elements of a section 1983 conspiracy

claim in Lumpkin, 2010 WL 1794400, at *5, Tully and Salach argue

that, as discussed with respect to the section 1983 claim,[21]

there is no constitutional violation and therefore no

constitutional injury of Castro's Fourth Amendment right to be

free from an unreasonable search and seizure.

In order to succeed in a section 1985(3) claim, the

plaintiff must show:  "(1) 'a conspiracy,' (2) 'a conspiratorial

purpose to deprive the plaintiff of the equal protection of the

---

[20]  A section 1983 conspiracy requires the plaintiff to prove
that "there has been, besides the agreement, an actual
deprivation of a right secured by the Constitution and laws."
Earle v. Benoit, 850 F.2d at 844 (internal brackets omitted).
[21]  Salach's memorandum refers to "Section 2 above," i.e., the
discussion of the section 1983 claim addressing the unlawful
seizure and excessive force claims.  (Docket Entry # 62, p. 6).

laws,' (3) 'an overt act in furtherance of the conspiracy,' and,
lastly, (4) either (a) an 'injury to person or property' *or* (b)
'a deprivation of a constitutionally protected right.'" <u>Soto-
Padre v. Public Bldg. Auth.</u>, 675 F.3d 1, 4 (1st Cir. 2012)
(quoting <u>Perez-Sanchez v. Public Bldg. Auth.</u>, 531 F.3d 104, 107
(1st Cir. 2008)) (emphasis added); <u>accord</u> <u>Alcyon v. Blanchard</u>,
83 F.3d at 3; <u>see</u> <u>Perez-Sanchez v. Public Bldg. Auth.</u>, 531 F.3d
104, 107 (1st Cir. 2008) (setting out the requisite elements).
Addressing Tully and Salach's personal injury argument, to
satisfy the fourth element the Supreme Court in <u>Griffin</u> deemed
sufficient a "personal injury" of clubbing the plaintiff "with a
blackjack, pipe or other kind of club." <u>Griffin v.
Breckenridge</u>, 403 U.S. 88, 91, 103 (1971). Here too, Castro's
personal injury of being shot or rammed by Tully's cruiser while
driving the Honda[22] creates a genuine issue of material fact as
to the injury element. Tully and Salach's argument that the
absence of a constitutional injury warrants summary judgment is
therefore not well taken. Based on the argument presented, they
are not entitled to summary judgment on Count Six.

Tully and Salach also fail to address in their memoranda
the claim in Count Six of being denied the "equal protection of

---

[22] Drawing reasonable inferences in Castro's favor, a jury could
find that ramming the Honda and pushing it onto the traffic
island likely resulted in a personal injury.

the laws" and the "equal privileges and immunities under the laws." (Docket Entry # 29, p. 22); see generally Diva's Inc. v. City of Bangor, 411 F.3d at 38. As a result, the equal protection and equal privileges and immunities section 1985 claim in Count Six remains in this action.

IV. Counts Eight and Nine:  Commonwealth of Massachusetts Constitutional Violations Against Tully and Salach

In Count Eight, Castro alleges that Tully and Salach violated the Massachusetts Declaration of Rights by virtue of the "unreasonable seizure" and use of deadly force "because he was Hispanic." (Docket Entry # 29, pp. 25-26). Count Eight additionally asserts that Tully and Salach stopped Castro "without probable cause or justification because he was Hispanic." (Docket Entry # 29, p. 25). In Count Nine, Castro contends that Tully and Salach violated the Massachusetts constitution by denying Castro his right "to equal treatment based on a finding of probable cause because he was Hispanic." (Docket Entry # 29, p. 26). Both counts allege that Tully and Salach "interfered by intimidation, coercion, and deadly force with the exercise or enjoyment by Castro" of these rights. (Docket Entry # 29, p. 26). Such language is associated with a violation of the Massachusetts Civil Rights Act, Massachusetts General Laws chapter 12, sections 11A, 11I ("MCRA"). Neither Count Eight nor Count Nine, however, cite to the MCRA.

At the outset, where, as here, a statutory vehicle exists under the MCRA to address a direct claim under the Declaration of Rights or the Massachusetts constitution, it is not appropriate to find a direct right of action under the Declaration of Rights or the Massachusetts constitution.  See Do Corp. v. Town of Stoughton, Civil Action No. 13-11726, 2013 WL 6383035, at *13 (D. Mass. Dec. 6, 2013) (citing Grubba v. Bay State Abrasives, Div. of Dresser Indus., Inc., 803 F.2d 746, 748 (1st Cir. 1986)); cf. Podgurski v. Dep't of Correction, Civil Action No. 13-11751-DJC, 2014 WL 4772218, at *7 (D. Mass. Sept. 23, 2014) ("'as a general proposition, a cause of action can, in certain circumstances, be brought directly under the Massachusetts Declaration of Rights in the absence of a statutory vehicle for obtaining relief'") (quoting Parsons ex rel. Parsons v. Town of Tewksbury, 2010 WL 1544470, at *4 (Mass. Super. Jan. 19, 2010)) (emphasis added).  Thus, "Courts have held that in most circumstances, plaintiffs may not bring direct claims under the state constitution but must instead bring a claim under the MCRA."  Thomas v. Town of Chelmsford, 267 F. Supp. 3d 279, 309 (D. Mass. 2017) (citing Martino v. Hogan, 643 N.E.2d 53, 59-60 (Mass. App. Ct. 1994), and Grubba v. Bay State Abrasives, Div. of Dresser Indus., Inc., 803 F.2d at 748). Accordingly, this court construes both counts eight and nine as

brought under the MCRA inasmuch as the claims succeed, if at all, under the statutory framework of the MCRA.

Tully and Salach argue that counts eight and nine are deficient because Castro "cannot offer any evidence to show that Tully either (1) interfered with his constitutional rights or (2) did so by the use of threats intimidation, or coercion." (Docket Entry # 60, p. 10) (Docket Entry # 62, p. 6).  They further contend that "there [was] no evidence that the traffic stop . . . directly violated [Castro's] civil rights."  (Docket Entry # 60, p. 10) (Docket Entry # 62, p. 6).  Tully also asserts there was "no evidence that [he] intended to intimidate [Castro] by stopping him or shooting him, or that he intended to stop [Castro] from engaging in any activity which he had a legal right to undertake."  (Docket Entry # 60, p. 12).  Finally, Tully and Salach maintain there is "no evidence in the record to suggest that [they] had any race based animus when [they] allegedly violated [Castro's] rights."  (Docket Entry # 60, p. 12) (Docket Entry # 62, p. 8).

In order to state a claim under sections 11H and 11I of the MCRA, "the plaintiff must prove that the defendants used 'threats, intimidation or coercion' to interfere with, or attempt to interfere with rights secured by the Constitution or laws of the United States or of the Commonwealth of Massachusetts."  Brum v. Town of Dartmouth, 704 N.E.2d 1147,

77

1162 (Mass. 1999) (affirming dismissal because complaint failed to allege threats, intimidation, or coercion).  In other words, the two components of a section 11H and 11I MCRA claim are "threats, intimidation or coercion and interference with a secured right."  <u>Banes v. Hub Folding Box Company, Inc.</u>, 1993 WL 818635 at * 4 (Mass. Super. Aug. 3, 1993); <u>see also</u> <u>French v. United Parcel Service, Inc.</u>, 2 F. Supp. 2d 128, 133 (D. Mass. 1998).

Turning to Tully and Salach's argument of the absence of any threat, intimidation, or coercion, a "threat" for purposes of the MCRA "'involves the intentional exertion of pressure to make another fearful or apprehensive of injury or harm.'"  <u>Felix v. Donnelly</u>, Civil Action No. 12-10997-IT, 2017 WL 2261127, at *7 (D. Mass. Mar. 28, 2017); <u>accord</u> <u>Planned Parenthood League of Massachusetts v. Blake</u>, 631 N.E.2d 985, 990 (Mass. 1994). "'Intimidation' involves putting in fear for the purpose of compelling or deterring conduct."  <u>Felix v. Donnelly</u>, 2017 WL 2261127, at *7; <u>accord</u> <u>Planned Parenthood</u>, 631 N.E.2d at 990. "Coercion," in turn, "'involves the application to another of such force, either physical or moral, as to constrain a person to do against his will something he would not otherwise have done.'"  <u>Felix v. Donnelly</u>, 2017 WL 2261127, at *7; <u>accord</u> <u>Planned Parenthood</u>, 631 N.E.2d at 990.

78

Notably, "The Massachusetts legislature intended that even
a *direct* deprivation of a plaintiff's rights 'would not be
actionable under the act unless it were accomplished *by* means of
one of these three constraining elements.'" Nolan v. CN8, 656
F.3d at 77 (quoting Buster v. George W. Moore, Inc., 783 N.E.2d
399, 409 (Mass. 2003)) (emphasis added); see Santiago v. Keyes,
890 F. Supp. 2d 149, 155 (D. Mass. 2012) ("the constitutional
violation itself cannot also serve as the prerequisite 'threats,
intimidation, or coercion' under the MCRA") (quoting Gallagher
v. Commonwealth, Civil Action No. 00-11859-RWZ, 2002 WL 924243,
at *3 (D. Mass. Mar. 11, 2002)).  Consequently, a
"'[defendant's] purported use of excessive force . . . does not
by itself involve threats, intimidation, or coercion and thus
does not implicate'" the MCRA.  Orwat v. Maloney, 360 F. Supp.
2d 146, 164 (D. Mass. 2005) (quoting Longval v. Commissioner of
Correction, 535 N.E.2d 588, 593 (Mass. 1989)); accord Rosencranz
v. Freeman, Civil Action No. 14-13050-JGD, 2017 WL 1217112, at
*11 (D. Mass. Mar. 31, 2017) ("Freeman's purported use of
excessive force, without more, is insufficient to support
Rosencranz's claim against him under the MCRA").

Here, no reasonable jury could find that either Tully or
Salach made any verbal or physical threats to Castro or tried to
"coerce" Castro within the meaning of the MCRA.  Although Tully
rammed the Honda and pushed it off the street onto the traffic

island, this conduct constitutes the use excessive force for the
excessive force claim.  Thus, like the plaintiff in Orwat,
Castro has established, "[a]t most, . . . deprivations and
threats, not deprivations by threats," Orwat v. Maloney, 360 F.
Supp. 2d at, 165 (quoting Columbus v. Biggio, 76 F. Supp. 2d 43,
54 (D.Mass. 1999), in parenthetical, that "MCRA requires 'nexus
between threats and deprivations of rights'"), or coercion.
Similarly, whereas Tully pointed and discharged his firearm at
Castro's vehicle, this conduct forms the gravamen of the
excessive force claim, i.e., the direct violation of Castro's
rights.  As such, it does not also function as the coercion or
intimidation.  See Santiago v. Keyes, 890 F. Supp. 2d at 155
(quoting Parks v. Town of Leicester, Civil Action No. 10-30120-
FDS, 2011 WL 864823, at *5 (D. Mass. Mar. 9, 2011), that "an
arrest 'of course can constitute a form of coercion,' but 'the
element of "threats, intimidation, or coercion" must be
*separately* present *in addition* to the violation of rights'").
In short, neither Tully nor Salach accompanied the purported
unlawful seizure or use of excessive force, if any, *by* "threats,
intimidation, or coercion" during their interactions with
Castro.  Summary judgment on the unreasonable or unlawful
seizure, use of deadly force, and unlawful stop without probable
cause secured rights in counts eight and nine is therefore
appropriate.

Finally, as noted, counts eight and nine raise claims that Castro was treated differently because of his race. (Docket Entry # 29, pp. 25-26). Tully and Salach argue there is an absence of evidence to suggest or imply a race-based animus. It is well established "that the Constitution prohibits selective enforcement of the law based on considerations such as race." Whren v. U.S., 517 U.S. 806, 813 (1996). "[T]he constitutional basis for objecting to intentionally discriminatory application of laws is the Equal Protection Clause, not the Fourth Amendment." Id. In order to succeed, Castro "must present evidence that he was treated differently from similarly situated non-[Hispanic] motorists and that the action taken against him was motivated, at least in part, by his race." Flowers v. Fiore, 359 F.3d 24, 35 (1st Cir. 2004).

In response to Tully and Salach identifying this absence of evidence, Castro does not come forward with sufficient evidence to allow a jury to find that Tully and/or Salach acted with a race-based animus and treated Castro differently because of his race. As the summary judgment target with the underlying burden of proof, it was incumbent on Castro to point to sufficient facts that would allow a jury to find in his favor that Tully and/or Salach treated him differently because of their race-based animus. Tully and Salach are therefore entitled to

summary judgment on the claims in counts eight and nine that

Castro was treated differently because of his race.[23]

## V.   Count One:  Assault and Battery Against Tully

In Count One, Castro asserts that, for no reason, "Tully

fired his service weapon at Castro and struck him with a

bullet." (Docket Entry # 29, p. 17).  In addition, the second

amended complaint alleges that, "Tully denied he had fired his

weapon and therefore could not have a justifiable reason for

doing so." (Docket Entry # 29, p. 17).  Tully moves for summary

judgment because he "used reasonable force." (Docket Entry #

60, p. 7).  Castro therefore fails in his underlying burden to

establish an assault and battery, according to Tully.

As pointed out by Tully, the First Circuit in Raiche

explains that:

> Where a plaintiff alleges both a section 1983 excessive
> force claim and common law claims for assault and battery,
> [the] determination of the reasonableness of the force used
> under section 1983 controls [the] determination of the
> reasonableness of the force used under the common law
> assault and battery claims.

Raiche v. Pietroski, 623 F.3d at 40; see also Dean v. Worcester,

924 F.2d 364, 369 (1st Cir. 1991) (affirming lower court's

summary judgment for defendant officers and finding that

plaintiff's "assault and battery claims were deficient because

---

[23]  It is therefore not necessary to address Tully and Salach's
alternative argument that there is no evidence of an
interference with Castro's constitutional rights.

the force used was neither 'excessive, unwarranted, unreasonable, nor unjustifiable'"). As determined above in the Count Five analysis, it remains a genuine issue of material fact whether the force used by Tully was reasonable under section 1983.[24] Accordingly, summary judgment is similarly not warranted on the Count One assault and battery claim against Tully based on the argument he presents.

## VI. Count Three:  IIED Against Tully

In Count Three, Castro alleges that Tully intentionally shot Castro "because he was Hispanic." (Docket Entry # 29, p. 19). The second amended complaint further alleges that, as the result of being wounded by Tully's bullet, Castro "continues to suffer[] severe emotional distress, resulting in physical, psychiatric and emotional symptoms." (Docket Entry # 29, p. 19).

Tully contends that his actions were not "'extreme or outrageous' as [he] had a right to shoot [Castro]." (Docket Entry # 60, p. 9) (quoting Restatement (Second) of Torts § 46, cmt. G (1965) ("behavior that otherwise might be extreme and outrageous is not if it is privileged, or if the actor is within his legal rights")). Tully also argues that, when an individual is "faced with deadly force either to himself or a third-party,"

---

[24] As previously discussed, Tully is entitled to qualified immunity on the excessive force claim.

he is "well within his legal rights to use deadly force."
(Docket Entry 60, p. 9) (citing Tennessee v. Garner, 417 U.S. 1,
11 (1985)). Because the deadly force he used "was legally
justified," Tully submits that Count Three is subject to summary
judgment.

An IIED claim requires a plaintiff to show that the
defendant "'(1) intended to inflict emotional distress by (2)
undertaking actions that were extreme and outrageous, thereby
(3) causing emotional distress which (4) was severe.'" Young v.
Wells Fargo Bank, N.A., 717 F.3d 224, 240 (1st Cir. 2013); see
Kennedy v. Town of Billerica, 617 F.3d 520, 530 (1st Cir. 2010).
"Extreme and outrageous conduct is behavior that is 'so
outrageous in character, and so extreme in degree, as to go
beyond all possible bounds of decency, and to be regarded as
atrocious, and utterly intolerable in a civilized community.'"
Young v. Wells Fargo Bank, N.A., 717 F.3d at 240 (quoting Foley
v. Polaroid Corp., 508 N.E.2d 72, 82 (Mass. 1987)).
Massachusetts law, therefore, "creates an extremely high hurdle
which must be overcome in order to maintain" an IEED claim.
Sneade v. Rojas, Civil Action No. 11-40061-TSH, 2014 WL 949635,
at *8 (D. Mass. Mar. 10, 2014) (defendant officer's conduct of
shooting plaintiffs' pet, 85 pound mixed-breed dog, that ran out
of kitchen and barked at officer but then remained sitting,
lacked "requisite level of outrageousness and atrocity").

84

Even when viewing the facts in the light most favorable to Castro by assuming that Tully intended to inflict emotional distress against him by drawing and firing his service weapon as well as ramming his cruiser into the Honda, Tully's conduct was, nevertheless, not extreme and outrageous.  Like the defendant officer in Sneade, who shot the plaintiffs' large, barking dog that remained sitting one to two feet away from the officer, see Sneade, 2014 WL 949635, at *5, 8, Tully's actions were not extreme and outrageous when he rammed the Honda to eliminate the threat posed to other potential motorists or pedestrians or when he shot Castro's vehicle as it reversed toward him as he tried to avoid being injured.  (Docket Entry # 69-3, p. 78).  Under the circumstances Tully faced, his conduct did not go "beyond all possible bounds of decency . . . in a civilized community." Young v. Wells Fargo Bank, N.A., 717 F.3d at 240.

Indeed, as to the gravamen of Count Three that Tully intentionally shot and wounded Castro, Tully discharged his weapon in the face of an imminent danger of death or serious injury to himself in accordance with this aspect of the applicable LPD policy.  See generally Robinson v. Cook, 706 F.3d 25, 38 (1st Cir. 2013) ("intentional-infliction-of-emotional-distress claim requires 'extreme and outrageous' behavior, and the legitimate police conduct disclosed by this record does not qualify") (citation omitted).  Moreover, Castro and Tully each

testified there was a car or cars behind the Honda on the traffic island.  (Docket Entry # 69-6, p. 82) (Docket Entry # 69-3, p. 61).  When Tully was going around the back of the Honda, it went in reverse leaving him with no place to easily move out of the way.  (Docket Entry # 69-3, p. 72).  As the vehicle reversed, Tully could only do his best to stumble out of the way.  (Docket Entry # 69-3, p. 45).  In sum, Count Three fails to survive summary judgment because Tully's actions were not extreme and outrageous.

VII.  Count Seven:  Section 1983 Violations Against the City

In Count Seven, Castro contends that the City failed to properly screen, train, and discipline its officers, and was "deliberately indifferent to the abuse of civil rights and failure to properly use deadly force by members of the [LPD]." (Docket Entry # 29, p. 24).  As also stated in Count Seven, Tully and Salach purportedly "interfered by intimidation, coercion, seizure, and deadly force with" Castro's exercise or enjoyment of his constitutional rights.  (Docket Entry # 29, pp. 24-25).  The City also purportedly failed to supervise its officers in their performance of traffic stops and their use of deadly force.  (Docket Entry # 29, pp. 23-24).

With respect to the deficient hiring or screening alleged in Count Seven, the City maintains that Castro "has no evidence that [its] hiring practices were inadequate" or otherwise

"constitute[d] 'deliberate indifference.'"   (Docket Entry # 64, p. 4).   The City contends that Castro "does not identify which officer [it] inadequately screened before hiring," despite there being "plenty of evidence on the record that the City conducted an adequate scrutiny" of both Tully and Salach's backgrounds before the City hired them as Lawrence police officers.   (Docket Entry # 64, p. 4).   According to the City, there is no information about either Tully or Salach that a "reasonable policy maker [could] conclude that a plainly obvious consequence of hiring Tully [or Salach] would be a deprivation of [Castro's] constitutional right."   (Docket Entry # 64, p. 5).

As to training, the City asserts "there is no evidence that [its] training was deficient or that [it] failed to develop a training program in disregard of a known or obvious risk of harm."   (Docket Entry # 64, p. 5).   The City therefore maintains that any failure to train does not amount to deliberate indifference.   (Docket Entry # 64, p. 6).   The City also argues that the City's policy of training is not deficient.   (Docket Entry # 64, p. 6).

With regard to the alleged failure to supervise, the City argues that Castro "has no evidence to show that [a] supervisor either participated in the conduct or tacitly authorized this conduct."   (Docket Entry # 64, p. 6).   In addition to the lack of causation, the City argues that Castro fails to show any

87

consistent, widespread pattern of supervisory misconduct.
(Docket Entry # 64, p. 7).

The City next contends that Castro fails to "show a
persistent failure to discipline that demonstrates the existence
of a custom or policy" of the City.  (Docket Entry # 64, p. 8).
With respect to the failure to discipline, the City further
argues that Castro "has not demonstrated deliberate
indifference" by which a "reasonable police department would
investigate similar instances of misconduct and discipline
officers in similar circumstances."  (Docket Entry # 64, p. 8).
Finally, the City asserts that Castro "failed to produce
evidence of repeated complaints of excessive force by Lawrence
police officers followed by [its] failure to investigate or
discipline."  (Docket Entry # 64, p. 8).

To render a municipality liable under section 1983, "a
plaintiff must show that the violation occurred as a result of
the municipality's 'policy or custom.'"  Freeman v. Town of
Hudson, 714 F.3d 29, 38 (1st Cir. 2013) (quoting Monell v. Dept.
of Social Services of the City of N.Y., 436 U.S. 658, 694
(1978); Rodriguez v. Municipality of San Juan, 659 F.3d 168,
181 (1st Cir. 2011) ("[l]iability only attaches where the
municipality causes the deprivation through 'an official policy
or custom'").  Section 1983 only imposes liability on local
governments "for 'their _own_ illegal acts.'"  Connick v.

88

Thompson, 563 U.S. 51, 60 (2011) (quoting Pembaur v. Cincinnati,
475 U.S. 469, 479 (1986)).  A plaintiff must therefore "identify
a municipal 'policy' or 'custom' that caused the plaintiff's
injury." Board of County Commissioners of Bryan County,
Oklahoma v. Brown, 520 U.S. 397, 403 (1997); see Connick, 563
U.S. at 51 (plaintiffs "must prove that 'action pursuant to
official municipal policy' caused their injury"); City of Canton
v. Harris, 489 U.S. 378, 385-387 (1989) (plaintiff must
establish "a direct causal link between a municipal policy or
custom and the alleged constitutional deprivation").  Moreover,
in addition to a municipal policy or custom that caused the
constitutional violation, the plaintiff must show that the City
is responsible for the violation, a level of fault that "is
generally labeled" as "'deliberate indifference.'"  Young v.
City of Providence ex rel. Napolitano, 404 F.3d 4, 26 (1st Cir.
2005); see Board of County Commissioners of Bryan County,
Oklahoma v. Brown, 520 U.S. at 403 ("plaintiff must show that
the municipal action was taken with the requisite degree of
culpability and must demonstrate a direct causal link");
Whitefield v. Meléndez-Rivera, 431 F.3d 1, 13 (1st Cir. 2005);
Crete v. City of Lowell, 418 F.3d 54, 66 (1st Cir. 2005)
("policy or custom must have caused the deprivation of the
plaintiff's constitutional rights and the municipality must have

the requisite level of culpability:  deliberate indifference to
the particular constitutional right of the plaintiff").

Here, as argued by the City, there are no facts rising to
the level of deliberate indifference with respect to any failure
to hire, screen, train, and discipline.  The LPD hired Tully
after he was honorably discharged from the United States Air
Force in 1996 and had served almost ten years as a Wilmington
police officer.  (Docket Entry # 69-3, pp. 8-10).  Tully's
performance as a Wilmington police officer was exemplary as
noted by a personal note from the Wilmington Mayor regarding
Tully's transfer to the LPD (Docket Entry # 65-7, p. 2) and the
letters of gratitude from professionals and citizens thanking
Tully for his assistance on varying cases and matters.  (Docket
Entry 65-7, pp. 20-22).  Salach was also honorably discharged
after serving over eight years in the United States Air National
Guard (Docket Entry # 65-6, p. 10) and received commendable
comments from past supervisors (Docket Entry # 65-6, p. 3).  In
hiring and screening Tully and Salach, the LPD did a thorough
review of their resumés, backgrounds, references, criminal
history, and previous work experience.  (Docket Entry # 65-7,
pp. 7-18) (Docket Entry # 65-6, pp 13-25).  The LPD found no
reason not to hire Tully and Salach and aptly viewed both of
them as appropriate candidates to become LPD officers.

Furthermore, the City ensures that all of its officers
receive the requisite level of training before they are allowed
to work "street duties." (Docket Entry # 69-8, p. 3).
Specifically regarding the use of firearms, the LPD requires
that all officers "qualify at least once a year using the
firearm they are authorized to carry on duty and will follow a
reasonable period of practice and training under the direction
of the Training Officer." (Docket Entry # 69-8, p. 3). All
Lawrence police officers must receive a "minimum passing score
of 80%" on the marksmanship exam. (Docket Entry # 69-8, p. 3).

In addition, all policies and procedures regarding training
and expectations of Lawrence police officers are set out in the
manual. Fitzpatrick testified that the LPD electronically
updates the manual and then those updated policies and
procedures are "placed on bulletin boards in two locations [,]
emailed to every officer, [and] read [during] the roll calls."
(Docket Entry # 69-1, p. 14). In addition, Fitzpatrick
testified that all officers can access the most current policies
and procedures manual through the LPD's website. (Docket Entry
# 69-1, p. 15). In his own testimony, Tully affirmed that he
was "familiar with the policies and procedures" of the LPD
(Docket Entry # 69-3, p. 10) while Salach testified that he had
received the LPD emails with the attached policies and
procedures. (Docket Entry # 69-17, 14). Salach reiterated that

91

he and other Lawrence police officers understood that the LPD's standing orders were "always in effect." (Docket Entry # 69-17, p. 15). Finally, Fitzpatrick testified that officers "going outside of a policy or procedure can result in discipline." (Docket Entry # 69-1, p. 17).

Regarding discipline, the LPD has clear policy guidelines in place to address any complaint filed against its officers. (Docket Entry # 69-2, p. 36). Complaints can be made anonymously through a variety of mediums. (Docket Entry # 69-2, p. 36). Fitzpatrick testified that he personally reviews complaint investigations once they are finished and that "in some instances [he] asks for additional fact finding." (Docket Entry # 69-2, p. 37). If a violation is found, Fitzpatrick "has additional options outside of only disciplining the officer" and that the officer may be subject to other "corrective measures." (Docket Entry # 69-2, p. 32). These corrective measures may include "retraining [or] additional training" of the officer. (Docket Entry # 69-2, p. 32). Indeed, with Tully, Scheffen immediately confiscated his service weapon, after discovering that a round had been fired, and then placed Tully on administrative leave. (Docket Entry # 69-3, p. 67).

As to the purported failure to supervise, the City maintains there is no evidence "that a supervisor either participated in the conduct or tacitly authorized" the conduct.

(Docket Entry # 64, pp. 6-8).  The City also maintains there is
no consistent, widespread practice of supervisors ignoring
shootings.  (Docket Entry # 64, p. 7).

Overall, there is a dearth of factual support of any custom
or policy that supervisors condone an improper or
unconstitutional use of force or illegal seizures.  Once the
crash between Tully's cruiser and Castro was called in, Michaud
met Tully at the Bennington Street traffic island to question
him about what had occurred.  (Docket Entry # 64, p. 7) (Docket
Entry # 69-3, p. 65).  The LPD did not conduct its own crime
scene analysis but rather requested assistance from the
Massachusetts State Police.  (Docket Entry # 69-17, p. 54).
Pierce questioned Salach about where Tully was standing when the
shooting occurred.  (Docket Entry # 69-17, p. 54).  The CSNE
provided its own independent assessment detailing the vehicle
crash and ballistic analyses.  (Docket Entry # 69-16, pp. 8,
12).

Finally, as noted above, Count Seven alleges that the City
"is deliberately indifferent to the abuse of civil rights and
failure to properly use deadly force by members of the LPD."
(Docket Entry # 29, p. 24).  There is, however, no evidence that
the City engages in any sort of deliberate indifference
regarding the hiring, screening, training, and disciplining of
its officers.  Fitzpatrick's testimony and the disseminated LPD

policies are evidence that the City not only thoroughly trains and informs its officers but that the City will discipline and retrain officers who do not comply with the policies.  The City holds itself accountable by providing a clearly established complaint process with the Chief of Police reviewing any claim dealing with excessive force.  (Docket Entry # 69-2, pp. 36-37). Thus, the failure to train or discipline allegations in Count Seven fail because the City has clear, structured policies and procedures that detail the training and the possible disciplining of Lawrence police officers.  The City also does not engage in any "deliberate indifference" regarding the abuse of civil rights or use of deadly force but rather adequately screens, hires, trains, and, if appropriate, disciplines Lawrence police officers.  The City is therefore entitled to summary judgment on Count Seven.

VIII.   Count Ten:  Massachusetts General Laws Chapter 258 Violation Against the City

In Count Ten, Castro asserts a negligent training and supervision claim against the City based on Tully negligently shooting Castro under the Massachusetts Tort Claims Act, Massachusetts General Laws chapter 258, section two ("MTCA"). Count Ten alleges that, "the City negligently failed to train its police officers" and that there was a "negligent custom or pattern of not supervising [officers] to prevent abuse of civil

rights, failure to find probable cause, and the improper use of deadly force before seizing." (Docket Entry # 29, p. 28).

The City asserts that Castro's allegation that the City is liable for a failure to train or supervise its officers "fails as there is no evidence that any City supervisor knew of [Tully's] alleged tort." (Docket Entry # 64, p. 10).  In addition, the City argues that, "In a failure to train and supervise context, there are no facts supporting a finding of negligence of public employees other than Tully that can be imputed upon the City." (Docket Entry # 64, p. 11).

Determining the City's liability for Tully's alleged negligence depends on whether a supervisor knew or should have known about Tully's negligent discharge of his firearm.  See Kennedy v. Town of Billerica, 617 F.3d at 533.  As stated in Kennedy:

> [T]hus far, Massachusetts cases have *only* allowed supervisory negligence claims against municipalities where the municipality knew or should have known about an underlying, identifiable tort which was committed by a named or unnamed public employee.

Id. (emphasis added); see Mass. Gen. Laws ch. 258, §§ 2, 10(c); Dobos v. Driscoll, 537 N.E.2d 558, 569 (Mass. 1989) (municipalities can be sued under MTCA for supervisory negligence "where the supervisory officials allegedly had, or should have had, knowledge of a public employee's assaultive behavior"); Doe v. Blandford, 525 N.E.2d 403, 408 (Mass. 1988).

Tully's negligent discharge of his service weapon, if any, is not traceable to any LPD supervisory negligence.  No supervisor knew that Tully had fired his service weapon until Scheffen conducted the initial debriefing with Tully and "noticed that there was a round missing and that [the service weapon] smelled as if it had been recently fired." (Docket Entry # 69-14, p. 4).  Scheffen then took immediate possession of Tully's service weapon.  (Docket Entry # 69-14, p. 4). Following the interviews with Scheffen and Zuk, Tully was sent "to the hospital because of high blood pressure." (Docket Entry # 69-3, p. 67).  After his release from the hospital, Tully "was driven home and then [he] was put on administrative leave." (Docket Entry # 69-3, p. 67).

As to training, throughout Fitzpatrick's testimony, Fitzpatrick emphasized how the LPD continues to update its training policies.  (Docket Entry # 69-1, p. 15).  Fitzpatrick also stated that officers "going outside of a policy or procedure can [be] disciplin[ed]." (Docket Entry # 69-1, p. 17).  Both Fitzpatrick and the LPD firearms policy emphasized that an officer must make a judgment whether his "life is in imminent risk or someone else's life is in imminent risk, before he is authorized to discharge his weapon." (Docket Entry # 69-1, p. 18).  Fitzpatrick also testified that an officer's use of force would not "be consistent with the policies and procedures

of the department if the officer [said] [he] accidentally discharged [his] weapon." (Docket Entry # 69-1, p. 20).

Additionally, Fitzpatrick testified that the LPD firearms policy does not consider the accidental discharge of a firearm a lawful and proper use of force. (Docket Entry # 69-1, p. 19). When an officer-involved shooting does occur, Fitzpatrick affirmed that it is the general policy of the LPD that the incident be "investigated by the state police rather than by the department." (Docket Entry # 69-2, p. 12). In this case, LPD did not conduct the ballistic investigation. Rather, CSNE, an outside organization, conducted a ballistic investigation and made an independent assessment. (Docket Entry # 69-16, p. 8, 12). In sum, the City's arguments as to the lack of negligence in supervision and training as well as the lack of evidence that the City knew or should have known about Tully's negligent conduct, if any, are well taken and Count Ten against the City is subject to summary judgment.

IX. City's Motion to Strike

Turning to the City's motion to strike, the City argues that Castro's summary judgment motion is untimely because Castro filed the motion "24 days after the deadline set by the Court." (Docket Entry # 73, p. 1). As previously noted, on September 13, 2017, this court set a deadline of October 20, 2017 to file dispositive motions. On November 22, 2017, this court reset the

summary judgment hearing from November 27, 2017 to January 3, 2018.  In light of the rescheduled summary judgment hearing, Castro argues that the City had ample time to oppose Castro's cross motion for summary judgment.

It is well established that this "court has significant discretionary authority to set and enforce filing deadlines in accordance with the Federal Rules of Civil Procedure, even when those deadlines are difficult for lawyers to meet."  See generally Perez-Cordero v. Wal-Mart Puerto Rico, 440 F.3d 531, 533 (1st Cir. 2006).  "[P]arties should not be allowed casually to flout [a case management deadline] or painlessly to escape the foreseeable consequences of noncompliance."  Velez v. Awning Windows, Inc., 375 F.3d 35, 41 (1st Cir. 2004); accord O'Connell v. Hyatt Hotels of Puerto Rico, 357 F.3d 152, 155 (1st Cir. 2004) ("litigants cannot be permitted to treat a scheduling order as a 'frivolous piece of paper idly entered, which can be cavalierly disregarded without peril'").  Deadlines for filing motions are essential to proper and effective case management.  See Serrano-Perez v. FMC Corporation, 985 F.2d 625, 627-628 (1st Cir. 1993) (stating that "discovery deadlines are necessary for" proper case management).  "What is more, litigants have an unflagging duty to comply with clearly communicated case-management orders."  Rosario-Diaz v. Gonzalez, 140 F.3d 312, 315 (1st Cir. 1998).  Finally, sanctions for ignoring case

management deadlines include "the preclusion of untimely summary judgment motions."  Id.

Here, Castro filed the cross motion for summary judgment on November 13, 2017, 24 days after the October 20, 2017 deadline. Like the defendants in Rosario-Diaz, Castro offers "no compelling explanation for [his] delinquency."  Rosario-Diaz v. Gonzalez, 140 F.3d at 315.  The fact that this court rescheduled the November 27, 2017 hearing to January 3, 2018 does not excuse Castro from not filing the dispositive cross motion for summary judgment on or before the October 20, 2017 deadline.  The City's motion to strike (Docket Entry # 73) is therefore well taken.

## CONCLUSION

In accordance with the foregoing discussion, this court **RECOMMENDS**[25] that Tully's motion for summary judgment (Docket Entry # 59) be **ALLOWED** for counts two, three, eight, and nine, and for the excessive force, Fourth Amendment section 1983 claim in Count Five based on qualified immunity; and **DENIED** as to Count One, Count Six, and the unlawful seizure, Fourth Amendment

---

[25]  Any objections to this Report and Recommendation must be filed with the Clerk of Court within 14 days of receipt of the Report and Recommendation to which objection is made and the basis for such objection.  Any party may respond to another party's objections within 14 days after service of the objections.  Failure to file objections within the specified time waives the right to appeal the order.

section 1983 claim in Count Five.[26]  This court further **RECOMMENDS**[27] that Salach's motion for summary judgment (Docket Entry # 61) be **ALLOWED** for counts two, eight, and nine as well as the unlawful seizure, Fourth Amendment section 1983 claim in Count Five; and **DENIED** as to Count Six.[28]

This court also **RECOMMENDS**[29] that:  the City's motion for partial summary judgment (Docket Entry # 63) be **ALLOWED** and counts seven and ten dismissed against the City;[30] the City's motion to strike Castro's cross motion for summary judgment (Docket Entry # 73) be **ALLOWED**; and Castro's cross motion for summary judgment (Docket Entry # 68) be **DENIED** as a result of the allowance of the motion to strike.


        /s/ Marianne B. Bowler
        **MARIANNE B. BOWLER**
        United States Magistrate Judge

---

[26]  The claim in Count Five against Tully that Castro's constitutional rights were violated "because he was Hispanic" also remains in this action.
[27]  See footnote 26.
[28]  The excessive force, Fourth Amendment section 1983 claim as well as the claim that Castro's constitutional rights were violated "because he was Hispanic" in Count Five remain in this action against Salach.
[29]  See footnote 26.
[30]  Count Four against the City remains in this action.